Lauril M. ALLIS, Appellant,

v.

Louis ALLIS, Jr. and Western Farms, Ltd., Appellees.

No. 23203.

United States Court of Appeals
Fifth Circuit.

June 7, 1967.

Allen Butler, Clark, West, Keller, Clark & Ginsberg, Dallas, Tex., for appellant.

Robert L. Blumenthal, Carrington, Johnson & Stephens, Dallas, Tex., for appellees.

Before THORNBERRY and COLEMAN, Circuit Judges, and YOUNG, District Judge.

THORNBERRY, Circuit Judge:

Appellant, Lauril M. Allis, challenges on this appeal the District Court's dis-missal of an action instituted by her for the purpose of establishing certain interests in Texas realty allegedly acquired during her marriage with appellee, Louis Allis, Jr. The District Court concluded that appellant was estopped to bring suit in Texas to relitigate the question of title because that issue had been previously decided adversely to her in a divorce proceeding in the State of Nevada. The judgment of the Nevada court, which was subsequently affirmed by the supreme court of that state, had determined the realty in question to be the sole and separate property of appellee Louis Allis, Jr. In dismissing appellant's claim, the District Court below was of the opinion that the prior adjudication by the Nevada court was res judicata of appellant's interests in the disputed property and therefore entitled to Full Faith and Credit in the courts of Texas. Careful review of the applicable Texas law, which governs this diversity action, convinces us that the judgment of the District Court should be affirmed.

In 1957, appellant and appellee Allis were lawfully married in the State of Florida. In January 1959, they moved to Texas.[1] In May of that year, appellee Allis purchased 314.6 acres of land located in Collin County, Texas, ownership of which is the disputed issue in this controversy.[2] At some time between May 1959 and October 1961, the spouses purchased a house trailer and moved it onto the Collin County property where they resided until the trailer was destroyed by fire in October 1961. After that date, the spouses resided in various locations in Dallas, McKinney, and Allen, Texas, until May 7, 1963, when appellee Allis removed himself to Nevada in order to establish permanent residence in that state. Shortly thereafter, he conveyed title to the realty in question to appellee Western Farms,

---

1. The issue whether appellee Allis intended on that date to establish permanent residence in Texas was disputed, appellee Allis contending that the spouses did not acquire domicile in Texas prior to June 1959.

2. Appellee Allis contended that on the date of purchase he was domiciled in the State of Wisconsin and that the purchase was made in his name alone, with his separate funds, and upon his separate credit.

Ltd., a Nevada corporation in which he was the sole stockholder. In June 1963, he initiated divorce proceedings against appellant in the Second Judicial Court of Nevada. Appellant appeared personally in the Nevada divorce proceedings and entered a counterclaim that she be awarded the divorce together with an equitable division of the marital property and a reasonable sum by way of alimony. After a full trial on the merits, the court awarded the divorce to appellant on her counterclaim together with alimony in the amount of $1,000 a month and the sum of $6,000 for the value of her community interests in the marital property. In its decision, which indicates that Texas law was applied to the facts, the Nevada court concluded that appellant had acquired no interest whatsoever in the Collin County property.[3] The divorce decree itself expressly provided that the disputed realty "was at the time it was transferred by Plaintiff to Western Farms, Ltd., the sole and separate property of the Plaintiff, and such conveyance to Western Farms, Ltd., was a valid and effective conveyance"; and that "the stock in Western Farms, Ltd., * * *, standing in the name of the Plaintiff is the sole and separate property of the Plaintiff without any right, title, interest or claim therein in the Defendant."

In October 1964, appellant instituted the present litigation in the state district court for Collin County, Texas, seeking a further adjudication of her interests in the Collin County property. On motion of the appellees, the cause was removed to the United States District Court for the Eastern District of Texas on the basis of diversity of citizenship. There appellees moved for summary judgment, relying upon the Nevada decree. On March 31, 1965, the District Court granted the motions with regard to certain personalty located on the Collin County property, but postponed any final determination in so far as title to the realty itself was concerned pending final disposition of the litigation in the courts of Nevada. On June 16, 1965, the Nevada Supreme Court entered a final order dismissing appellant's appeal in the divorce proceedings, and, on October 18, 1965, the District Court granted appellees' motions for summary judgment in their entirety.

Inextricably involved in the resolution of this controversy is the often adjudicated, much discussed issue of the appropriate degree of recognition to be accorded equitable decrees affecting realty situated beyond the jurisdiction of the rendering court.[4] In Fall v. Eastin, 1909, 215 U.S. 1, 30 S.Ct. 3, 54 L.Ed. 65, the doctrine arose that a court has no jur-

3. More specifically, in its findings of facts and conclusions of law filed on January 15, 1965, the court found that at the time the disputed property was purchased by appellee Allis he was domiciled in the State of Wisconsin and did not become a resident of Texas until sometime after the purchase; that the down payment and all subsequent annual payments of principal were made from his separate property acquired prior to marriage; that there never occurred any commingling of community funds or community credit in connection with the purchase or in connection with subsequent principal or interest payments; that the promissory note given by appellee Allis was executed solely by him and solely upon his separate credit; that the conveyance to Western Farms, Ltd., was fully revealed to appellant and was not done with intent to defraud her; and that if any portion of the disputed realty had ever been homestead it had been aban-

doned as homestead long prior to the date of such conveyance. Record, pp. 58–63.

4. See generally Barbour, the Extra-Territorial Effect of the Equitable Decree, 17 Mich.L.Rev. 527 (1919); Currie, Full Faith and Credit to Foreign Land Decrees, 21 U.Chi.L.Rev. 620 (1954); Goodrich, Enforcement of A Foreign Equitable Decree, 5 Iowa L.Bull. 230 (1920); Hancock, Full Faith and Credit to Foreign Laws and Judgments in Real Property Litigation: The Supreme Court and the Land Taboo, 18 Stan.L.Rev. 1299 (1966); Lorenzen, Application of Full Faith and Credit Clause to Equitable Decrees for the Conveyance of Foreign Land, 34 Yale L.J. 591 (1925); Reese, Full Faith and Credit to Foreign Equity Decrees, 42 Iowa L.Rev. 183 (1957); Schwartz, Fall v. Eastin Revisited: Extraterritorial Effect of Foreign Land Decrees, 54 Dick. L.Rev. 293 (1950), and the numerous cases cited and discussed therein.

isdiction ver realty located in another state and that any decree purporting to have an in rem effect on such foreign realty is void, thus relieving the situs state of any obligation to recognize that judgment under principles of Full Faith and Credit. A significant, seemingly incongruous exception to this doctrine is that a court having in personam jurisdiction over a litigant may indirectly act upon realty situated in another jurisdiction by means of an equitable decree directing that party to convey title to the foreign realty to another. If the court, having properly acquired such personal jurisdiction over the party before it, enforces its decree by compelling a conveyance, even though it be upon pain of contempt, such conveyance is entitled to Full Faith and Credit in the situs state.[5] If, however, the party subject to the equitable decree should remove himself from the court's jurisdiction before the order to convey can be enforced, Fall v. Eastin stands for the proposition that the situs state need not extend Full Faith and Credit to the unexecuted decree. Nevertheless, a number of state courts have chosen to recognize the validity of unexecuted equitable decrees, apparently upon the theory that the situs state is no more deprived of exclusive jurisdiction over its realty by implementing such decrees than by according Full Faith and Credit to deeds actually executed under foreign court orders.[6]

In McElreath v. McElreath, 1961, 162 Tex. 190, 345 S.W.2d 722, the Texas Supreme Court drew heavily upon the reasoning of these state court decisions to enforce an equitable decree entered by an Oklahoma court in a divorce proceeding which ordered the transfer of title to realty located in Texas. In that decision, the court chose to recognize the foreign decree on principles of comity rather than under the doctrine of Full Faith and Credit, reasoning that

> Comity, in the absence of a controlling decision by the United States Supreme Court under the "Full Faith and Credit" clause, seems the preferable basis for a state court decision. In that way there is no danger of restricting the scope of state public policy by a prediction of what the United States Supreme Court may hold in any given situation. Our holding therefore is that as a matter of comity we will enforce the equitable decrees of a sister state affecting Texas land so long as such enforcement does not contravene an established public policy in this State.

345 S.W.2d at 733. The decree before the court in *McElreath,* however, unlike that involved in the instant controversy, was rendered incident to divorce proceedings between spouses who were nonresidents of Texas and whose marital domicile was in a state other than Texas. In addition, that decree contained an order specifically requiring the husband to convey title to Texas realty to his ex-wife. Our role in this diversity action therefore becomes that of determining whether the reasoning adopted by the court in *McElreath,* in so far as it may be applicable to the facts before us, supports the action of the District Court in dismissing appellant's suit. Proper resolution of this issue necessarily calls for careful scrutiny of the controlling principles upon

5. Fall v. Eastin, supra; Carpenter v. Strange, 1891, 141 U.S. 87, 11 S.Ct. 960, 35 L.Ed. 640; Groom v. Mortimer Land Co., 5th Cir. 1912, 192 F. 849, cert. denied, 225 U.S. 700, 32 S.Ct. 835, 56 L. Ed. 1264.

6. See, e. g., Rozan v. Rozan, 1957, 49 Cal. 2d 322, 317 P.2d 11; Redwood Inv. Co., etc. v. Exley, Dist.Ct.App.1923, 64 Cal. App. 455, 221 P. 973; Idaho Gold Mining Co. v. Winchell, 1899, 6 Idaho 729, 59 P. 533; Meents v. Comstock, 1943, 230 Iowa 63, 296 N.W. 721; Matson v. Matson, 1919, 186 Iowa 607, 173 N.W. 127; Dunlap v. Byers, 1896, 110 Mich. 109, 67 N.W. 1067; McCune v. Goodwillie, 1907, 204 Mo. 306, 102 S.W. 997; Weesner v. Weesner, 1959, 168 Neb. 346, 95 N.W.2d 682; Burnley v. Stevenson, 1873, 24 Ohio St. 474; McElreath v. McElreath, 1961, 162 Tex. 190, 345 S.W.2d 722; Bailey v. Tully, 1943, 242 Wis. 226, 7 N.W.2d 837, 145 A.L.R. 578; Mallette v. Scheerer, 1916, 164 Wis. 415, 160 N.W. 182.

which the *McElreath* court relied to justify its decision.

In choosing to enforce that portion of the Oklahoma decree which specifically ordered the conveyance of Texas realty, the court in *McElreath* rejected the contention that the mere existence of a Texas statute prohibiting a court in a divorce action from ordering either spouse to divest himself of title to separately owned property constituted a sufficient policy basis to justify nonenforcement. In so concluding, the court reasoned that the statute was intended to apply only to Texas courts rendering divorce decrees in suits involving Texas residents—that the public policy expressed in the statute was not intended to encompass settlements reached by the courts of other states involving marital property disputes peculiar to residents of those states. The court was careful, moreover, to draw a distinction between an in rem decree purporting to directly affect title to land in another state and an equitable in personam decree limited to ordering a party before the court to convey title to foreign realty. Construing the direct order to convey in the Oklahoma decree as essentially in personam in nature, the court chose to enforce it on principles of comity, having concluded that no well-defined public policy of Texas dictated against its implementation. In reaching such result, the court necessarily rejected the contention that an unexecuted equitable decree directing the conveyance of title to realty situated in another state is in essence in rem and thus beyond the jurisdiction of the foreign court to enter:

> [N]o in rem effect is given to the Oklahoma decree. It does not pass title. It is the action of the Texas court in giving effect to the findings of fact supporting the Oklahoma decree which effects a transfer of title.

345 S.W.2d at 733. Therefore, in *McElreath,* as here, the court was confronted with two critical issues: (1) whether the decree of the foreign court was in excess of its jurisdictional powers; and, assuming the existence of jurisdiction, (2) whether some overriding state policy dictated against implementation of that decree by a court of the situs state.

## I.

Looking initially to matters of form, it is apparent that the decree before us, unlike that involved in *McElreath,* fails to contain the readily recognizable in personam order directing the execution of a conveyance. It simply provides that the Collin County realty "was at the time it was transferred by Plaintiff to Western Farms, Ltd., the sole and separate property of the Plaintiff, and such conveyance to Western Farms, Ltd., was a valid and effective conveyance." The absence of an express order to convey does not appear at all extraordinary, however, in view of the Nevada court's determination that title to the realty in dispute had at all times remained in appellee Allis. Under such circumstances, any order requiring appellant to convey title or to execute a release to appellee Allis of any interest she might claim in the realty would have been superfluous. Mindful of the *McElreath* court's declaration that "any portions of * * * [a] decree purporting to act in rem would be ineffective because of a lack of jurisdiction," we nevertheless conclude that the mere failure of the Nevada court to include in its decree a formal order to convey cannot under the facts be properly construed as evidencing an intent on the part of that court to exceed its jurisdictional powers. Both spouses personally appeared in the Nevada proceedings, voluntarily subjecting themselves to the in personam jurisdiction of the Nevada court. In her counterclaim, appellant affirmatively invoked the power of that court to award the divorce to her and to adjudicate her interests in the marital property. She did not at that time, nor does she now urge that the in personam jurisdiction thus acquired by the Nevada court was in any respect improper. Neither does she dispute the proposition that had the court deemed it necessary, it could have coerced the execution of a

release of any interest that she claimed in the Texas realty, which would have clearly been binding upon the Texas courts. This being so, she cannot now successfully argue that the Nevada decree, which in essence manifests a refusal to recognize a personal obligation on the part of appellee Allis to convey title to her, represents any less conclusive adjudication of the personal rights and duties of the parties than would a decree which did, in fact, recognize a personal obligation to convey. It cannot be logically contended that the power of a court to render a binding determination of the personal rights and obligations of those parties over whom it has properly acquired in personam jurisdiction can be in any respect diminished or destroyed by the mere form of a decree entered pursuant to that jurisdiction. It is far more in keeping with sound jurisdictional concepts to conclude that such decree, regardless of its specific wording, should be looked upon as conclusive of the personal equities therein determined, such equities having been inarguably adjudicated upon a legitimately established foundation of in personam jurisdiction. The mere fact, moreover, that such validly created rights and obligations may to some degree involve the parties' interests in foreign realty cannot negate the in personam effect of the decree creating those equities. The court in *McElreath* recognized as much in its opinion on motion for rehearing:

> In numerous opinions an in rem judgment rendered by a court of one state purporting to directly affect the title to land in another state is spoken of as being void for want of jurisdiction over the subject matter. In a sense, it could be argued with reason that this Court cannot authoritatively say that an Oklahoma decree which has been affirmed by the Supreme Court of that state is *void*. We may say, however, that a portion of the decree is *inoperative* in this state when it purports to act in rem so as to directly affect the title to Texas lands. In

determining whether or not a decree of a sister state, or the equities upon which it is based should be enforced in this state, we may also consider matters which go to the jurisdiction of the court of the sister state over the persons involved in the particular suit as well as the res. In this case, the order of the Oklahoma court entered in accordance with the law which controls the marital rights of the parties was an order operating in personam and one which the Oklahoma court had jurisdiction to render. That court also had jurisdiction of the parties litigant. * * * [T]his jurisdictional status could not be changed by one of them crossing the Red River into Texas after their respective rights had been settled and adjudicated by the Oklahoma courts. 345 S.W.2d at 744. We may thus conclude, in accordance with the rationale adopted in *McElreath*, that it was the action of the District Court below in choosing to give operative effect to the findings of fact upon which the Nevada decree was based, and not the action of the Nevada court itself, which directly affected title to the disputed realty.

## II.

■ Having concluded that the courts of Texas would be unlikely to look upon the Nevada decree as void for want of jurisdiction, we reach the final, yet equally critical issue whether such decree should be given binding effect on principles of comity. In keeping with *McElreath*, we must determine whether recognition of the decree would have the effect of contravening some well-defined policy of the State of Texas. More specifically, the appropriate inquiry is whether giving deference to that decree "would be against good morals or natural justice, or for some other reason would be prejudicial to the state or its citizens." 345 S.W.2d at 746 (quoting 15 C.J.S. Conflict of Laws § 4(b), at 854).

■ Initially, we are constrained to recognize the limited scope of *McElreath*

made explicit by the court at the outset of its opinion:

This is not a case wherein one of the parties moved from Texas to Oklahoma for the purpose of establishing residence for divorce purposes. Neither is this a case wherein either party because of residence in Texas had acquired property rights under and by virtue of the marital laws of this State. We are not called upon to pass upon the hypothetical rights of hypothetical persons in the situations mentioned.

345 S.W.2d at 723–724. It is thus apparent that the present controversy presents in a justiciable context the very "hypothetical" situation concerning which the court in *McElreath* expressly deferred judgment. Here, appellee Allis did, in fact, remove himself to another jurisdiction in order to establish residence for divorce purposes, and here, the central issue in dispute is whether the Texas realty was acquired under the marital laws of Texas. It thus falls our lot to anticipate the result most likely to be reached by a Texas court were it confronted with the same issue. Fully cognizant that our role in this diversity context is restricted to that of implementation rather than innovation, we are confident that affirmance of the District Court's dismissal of the instant suit will serve to promote rather than frustrate the policies enunciated in *McElreath*. The significant underlying principle pervading the court's analysis in *McElreath* is succinctly set forth in the majority opinion on motion for rehearing:

As pointed out in the original opinion, if there be any semblance of fairness achieved in settling the property rights of divorcing persons holding property in two or more states, it must be done by a court operating in one jurisdiction. The problem cannot be adequately solved by the piecemeal attempts of several courts in several states.

The question of the enforceability of equitable decrees arising out of divorce cases relating to lands in states other than the matrimonial domicile is one of growing importance. It demands some solution which is hardly met by the adoption of a strictly "hands off" or "do nothing" policy on the part of the courts of the states wherein the real property may be located.

345 S.W.2d at 748. Adhering to this controlling principle, the majority in *McElreath* chose to enforce the decree in that case in the face of the vigorous contention of four members of the court that the existence of a state statute expressly prohibiting Texas courts from entering a similar decree afforded compelling evidence of a policy sufficient to deny enforcement. Significantly, in the case before us, no state statute nor policy has been brought to our attention which might conceivably be frustrated by a recognition of the rights and obligations adjudicated by the Nevada decree. As previously noted, both spouses appeared personally before the Nevada court, and the record of the proceedings in that court demonstrates that Texas law was applied to determine their interests in the marital property. By way of counterclaim, appellant affirmatively invoked the power of the Nevada tribunal to adjudicate her interests in the marital property, thereby obtaining substantial benefits under the court's decree.[7] The mere possibility, which has not even been advanced in this con-

7. In support of its decision, the court in *McElreath* expressly cited several prior Texas cases which had sustained the validity of foreign equitable decrees involving Texas realty on the theory that a party who had affirmatively invoked or acquiesced in the jurisdiction of a foreign court to adjudicate his personal interests in such realty would be estopped to challenge the conclusive, in personam effect of that determination in a subsequent action instituted in the situs state. See Milner v. Schaefer, Tex.Civ.App. 1948, 211 S.W.2d 600, writ refused; Greer v. Greer, Tex.Civ.App.1945, 189 S.W.2d 104, rev'd on other grounds, 1946, 144 Tex. 528, 191 S.W.2d 848; Hall v. Jones, Tex.Civ.App.1932, 54 S.W.2d 835, no writ history.

troversy, that a foreign court might fail to apply the law of Texas exactly as a Texas court might apply it, is not, in our opinion, sufficient to justify attributing to the State of Texas an established policy requiring a second application of the same law by its own courts. Cf. Fauntleroy v. Lum, 1908, 210 U.S. 320, 28 S.Ct. 641, 52 L.Ed. 1039. As aptly recognized by the court in *McElreath*:

> There is something incongruous and out of keeping with the concept of orderly processes to tolerate a situation wherein solemn court decrees may be flouted by playing hop-skip with state boundaries.

345 S.W.2d at 724.

Applying the foregoing principles to the specific facts before us, we are convinced that the action of the District Court in choosing to give conclusive effect to the rights and equities adjudicated in the Nevada proceedings cannot be viewed as incompatible with any well-defined public policy of the State of Texas. Accordingly, the judgment of the District Court is

Affirmed.