638 So.2d 493 (1994)
In the MATTER of the Last WILL and Testament of William Harry FANKBONER, Deceased.
Joseph PALLATIN
v.
Kandy JONES, Executrix of the Estate of William Harry Fankboner, and Ezekiel Jones, a Minor.
No. 91-CA-0221.
Supreme Court of Mississippi.
June 9, 1994.
*494 Michael W. Crosby, Gulfport, for appellant.
Wayne L. Hengen, Hengen & Hengen, W. Eugene Henry, Biloxi, for appellee.
EN BANC.

ON PETITION FOR REHEARING
BANKS, Justice, for the Court:
The petition for rehearing is granted, the original opinion is withdrawn and this opinion substituted therefor.
In this will contest, Joseph Pallatin asks that we overturn the trial court's findings that the daughter of the testator did not unduly influence the testator to change his will and leave her one-half of his monetary assets and personal property to the exclusion of Pallatin and other charitable organizations. We are also asked to determine whether attorney fees and costs paid by him, without prior court approval, should be charged to him, and to revisit the question of sanctions under Rule 11 of the Mississippi Rules of Civil Procedure and the Litigation Accountability Act of 1988. Except as to the issue of unapproved expenditures and sanctions, we affirm.

I.
Joseph Pallatin, filed a petition seeking construction and validity of the last will and testament of his deceased friend, William Harry Fankboner.[1] Joseph sought to have the court find that Fankboner intended his first will to rule and to find that Kandy Jones unduly influenced Fankboner to draft a new will, naming her as one of the primary beneficiaries. The chancery court granted Kandy Jones a partial directed verdict and found that no justiciable issue existed as to Fankboner's mental competency. During the proponent's case in chief, Jones testified that on May 3, 1989, Fankboner wrote her and asked her to forgive him and to always remember that she is his daughter. It was during her testimony that Pallatin became aware of this letter and other notes from Fankboner.
*495 After deliberation, the jury found that Jones did not unduly influence Fankboner to change his will. In the final judgment, the chancellor awarded attorney fees and costs against Pallatin, ordered him to reimburse monies spent from the estate's account, and sanctioned him pursuant to Rule 11 of the Mississippi Rules of Civil Procedures and the "Litigation Accountability Act of 1988." Aggrieved, Joseph Pallatin filed this appeal.

II.
In an action contesting a will, a presumption of undue influence arises where there is a confidential or fiduciary relationship. Mullins v. Ratcliff, 515 So.2d 1183, 1192 (Miss. 1987). Suspicious circumstances, along with the confidential relationship, also give rise to a presumption of undue influence. See Estate of Lawler v. Weston, 451 So.2d 739, 741 (Miss. 1984). In the instant case, Jones, one of the principal beneficiaries, contacted the attorney, Hengen, who represented her in the conservatorship and in the preparation of the testator's will; she actively participated in the procurement and preparation of the testator's will; there was no communication between the attorney, Hengen, and the testator, Fankboner; Jones delivered the will from Hengen to her father; and Jones allegedly stepped into the next room while the will was being executed, and then she returned to the room and took possession of the will once it was signed. However, in her deposition, she testified that she was in the room while Fankboner signed the will. These suspicious circumstances, along with the conceded confidential relationship that Jones stated existed between Jones and Fankboner, gave rise to a presumption of undue influence in the instant case.
In order for Jones to have overcome this presumption of undue influence, the evidence must have shown by clear and convincing evidence that (A) Jones exhibited good faith in the fiduciary relationship with Fankboner; (B) Fankboner acted with knowledge and deliberation when he executed the September 13, 1989 will; and (C) Fankboner exhibited independent consent and action. Murray v. Laird, 446 So.2d 575, 578 (Miss. 1984) as modified in Mullins, 515 So.2d at 1193.

A.
To determine if Jones acted in good faith when she procured the September 13, 1989, will, the identity of the initiating party, who sought the preparation of Fankboner's will, must be determined. In making this determination, it is significant that Fankboner told two totally disinterested witnesses that he wanted to change his will. In Vega v. Estate of Muller, then Presiding Justice Hawkins stated:
In those cases where you admittedly have a confidential relations transfer from a dependent to a dominant party, it seems to me that the ultimate test should be something on the order of the following: Excluding the testimony of the grantee, those acting in the grantee's behalf (such as the attorney), and any others who could have a direct or indirect interest in upholding the transfer (such as grantee's family), is there any other substantial evidence, either from the circumstances, or from a totally disinterested witness from which the court can conclude that the transfer instrument represented the true, untempered, genuine interest of the grantor? If the answer to this question is yes, then it becomes a question of fact whether or not there was undue influence. If the answer is no, then as a matter of law the transfer is voidable.
Vega v. Estate of Muller, 583 So.2d 1259, 1275 (Miss. 1991) (Hawkins, P.J., dissenting).
In the instant case, the two disinterested witnesses were Sergeant Jones and Captain Beverly Tuomala. Sergeant Jones, a medical service specialist and shift leader at Keesler Air Force Base, and one of the subscribers to the September 1989 will, testified that Fankboner talked about changing his will several weeks prior to signing it and that Fankboner went over the will several times before signing it. The second subscribing witness, Captain Beverly Tuomala, testified that Fankboner was a very good communicator and a very adamant individual. She stated that she asked him if that was his will and if he wanted her to sign it, he nodded yes and pointed to the area where she needed to sign.
*496 Secondly, the place of the execution of the will and the persons in whose presence the will was executed are significant. The will was executed at the Keesler Medical Center. The two subscribing witnesses, Captain Tuomala and Sergeant Jones, along with other medical personnel, were present.
The third and fourth factors are the consideration/fee that was paid and the identity of the person who paid the fee. The fee was paid from Fankboner's account, which was at the time a conservatorship account. Jones testified that in her capacity as conservatrix, she paid for the will on Fankboner's behalf.
The fifth and last factor that should be considered to determine the "good faith" of Jones is the secrecy and openness given the execution of the will. The evidence indicated that the execution was quite open and well observed, given the layout of the intensive care unit where Fankboner was being monitored. Jones' contention that her father, Fankboner, initiated the new will is not only supported by her testimony, but by the subscribing witnesses' testimony. In addition, Barbara Champ, a witness for Pallatin, testified that Fankboner told her that he wanted to take care of his family and to exclude the charitable organizations that he listed in his February 3, 1989, will. We find that substantial evidence existed to support a finding that Jones showed good faith.

B.
According to the test delineated in Murray, there are four factors that should be used to determine Fankboner's knowledge and deliberation at the time that the will was executed:
a) his awareness of his total assets and their general value, b) an understanding by him of the persons who would be the natural inheritors of his bounty under the laws of descent and distribution or under a prior will and how the proposed change would legally affect the prior will or natural distribution, c) whether non-relative beneficiaries would be excluded or included and, d) knowledge of who controls his finances and business and by what method, and if controlled by another, how dependent is the grantor/testator on him and how susceptible to his influence.
Murray, 446 So.2d at 579. Jones stated that Fankboner told her that he wanted her to buy him a trailer to live in because he did not want to live in a nursing home. Jones also stated that Fankboner told her to get his ex-wife (and her mother) to travel from Dallas, Texas, to tend to his needs and to hire a couple to help take care of him. In granting the partial directed verdict, the chancellor in the instant case stated that, "[e]veryone who has testified said that up until the date he passed away, almost  and I think up until that day  that he was giving directions, that he understood the extent of his holdings and that he was sharp mentally, that he was writing notes, that he was participating in this and that."
Secondly, we have recognized that the "disclosure of intent made prior to execution of an instrument helps dilute the undue influence presumption." Mullins, 515 So.2d at 1194 quoting Murray, 446 So.2d at 578-79. Witness for Pallatin and long-time friend of Fankboner, Barbara Champ, testified that Fankboner told her in August of 1989, prior to the execution of the September 13, 1989, will, that he wanted to change his will to exclude the different charitable organizations and to include his family. She stated that Fankboner told her that he should take care of his own first and the ones that took care of him. As here, in Taylor we explained that there was no undue influence because the evidence showed that "Mr. Taylor was a strong willed person, dominant over his children and was a man who thought things out for himself, made his own decisions and backed them up with action." Taylor v. Welch, 609 So.2d 1225, 1232 (Miss. 1992). "Even up to the point of his death, Mr. Taylor was the boss...." Id. We agree with the chancellor that the evidence indicates that Fankboner was completely aware of his assets and value.

C.
The law requires clear and convincing evidence of independent consent and action by the testator. Murray, 446 So.2d at 578. In the instant case, the evidence is replete *497 with statements that Fankboner acted independently of Jones. Even the contestant, Pallatin, testified that Fankboner appeared to be a rational, sound-of-mind human being who was a gruff and cantankerous person off and on, stubborn, strong-willed, and always independent up until the time he died. Father Joe Romanski, also a witness for Pallatin, testified that Fankboner liked the idea of being independent and in control of his own life; he was a man who tried to hold on to life in his own way and on his own terms; and he was very much a strong-willed person who always wanted to manipulate  to direct his future.
Given the facts and the circumstances of this case, the evidence is sufficient to clearly and convincingly show that Jones did not substitute her intent for that of Fankboner. We conclude that this assignment of error is without merit.

III.
Pallatin contends that the chancellor erred when he charged him $8,305.44 for legal fees and other expenses paid in connection with the estate proceedings in Indiana and Arkansas, as well as the legal fees paid to his attorney, Michael W. Crosby. Jones argues that we should follow our reasoning in Clarksdale Hospital v. Wallis that attorneys' fees are the personal obligation of the executor or administrator and compel Pallatin to reimburse the Fankboner estate. Clarksdale Hosp. v. Wallis, 187 Miss. 834, 843, 193 So. 627 (1940). However, in Clarksdale Hospital, we noted that the personal obligations "may be reimbursed from the estate if the Court be of the opinion that the services were necessary and rendered in good faith." Id. See Scott v. Hollingsworth, 487 So.2d 811, 813 (Miss. 1986) ("even though attorneys' fees are the personal obligation of the administrator or executor, they may be paid out of the estate as administration expenses").
In Harper v. Harper, 491 So.2d 189, 200 (Miss. 1986), we stated that the standard for determining attorneys' fees is found in section 91-7-281 of Mississippi Code Annotated which provides in pertinent part that:
in annual and final settlements, the executor, administrator, or guardian shall be entitled to credit for such reasonable sums as he may have paid for the services of an attorney in the management or in behalf of the estate, if the court be of the opinion that the services were proper and rendered in good faith.
Miss. Code Ann. § 91-7-281 (1972). Rule 6.07 of the Uniform Chancery Court Rules provides that "claims arising after the death of a decedent, such as funeral bills, expenditures for monuments, attorney's fees, and the like must be approved by the Chancellor before payment. Otherwise, payment thereof will be at the risk of subsequent disapproval by the chancellor as to the propriety or reasonableness thereof." Miss.Unif. Chan.Ct.R. 6.07 (emphasis added).
In the instant case, Pallatin admitted that he did not get a court order to pay the $8,305.44. Pallatin explained that he proceeded under Indiana law which provides that "[i]f you are a beneficiary or executor in any will, even though there is another will that comes up you still have a duty to go forward, as long as you do so in good faith, to prosecute that will and to have it decided which will is to control. And even if you lose, you still have a right to costs and attorney fees... ." In Mississippi, we have said that an executor or executrix who acts without prior court approval, does so at his or her peril. Harper, 491 So.2d at 200. That is not to say, however, that a fiduciary who makes good faith expenditures is not entitled to reimbursement based solely on the fact that they were made prior to court approval. Id. A fiduciary so acting simply runs the risk that the court will disapprove the expenditures based on a determination that they were not necessary to the administration of the estate or otherwise improper. Id. (Executor surcharged for part, but not all of attorney fees paid without prior authority of the court); see also Miss.Unif.Chan.Ct.R. 6.07.
Here, the items which go to make up the $8,305.44, include matters ordinarily incident to the administration of an estate as well as items incident to the present litigation. In light of our disposition as to sanctions, it is certainly conceivable that expenditures made in connection with some or all of this litigation *498 could be considered reasonable and necessary to the fair administration of the estate. See Burns Ind. Code Ann. § 29-1-10-14 (1993).
As we understand the decision of the chancellor, the court below never reached the issue of the propriety of the expenditures, but instead based its conclusion in this regard on the finding that no estate proceedings should ever have been commenced in Indiana. The court cited no authority for this conclusion and it has not been briefed by the parties. On the face of it, the deceased had personal property in the state of Indiana giving that state a sufficient nexus for the administration of the estate. See Miss. Code Ann. § 91-7-1 (1972); Burns Ind. Code Ann. 29-1-10-1 (1993). The named executor resided in that state and consideration of that fact would indicate that administration there would be the most economical for the estate. There may be other considerations which dictated the chancellor's conclusion.
For the foregoing reasons, we reverse as to this issue and remand for further consideration.

IV.
Pallatin contends that the sanctions that he received under both Mississippi Rules of Civil Procedure 11 and the "Litigation Accountability Act of 1988" are unwarranted since he had a good-faith belief when he initiated the complaint. Under Rule 11(b), sanctions are warranted when the pleading or motion is 1) frivolous or 2) is filed for the purpose of harassment or delay. Miss.R.Civ.P. 11. Under the "Litigation Accountability Act of 1988," the chancellor must have first found that the action was brought without substantial justification, that it was interposed for delay or harassment, or that it unnecessarily expanded the proceedings. Miss. Code Ann. § 11-55-1 (Supp. 1993).
Pallatin contends that at the time of filing, he believed that the case had merit, based upon the information that he had. Pallatin further contends that, objectively viewed, that belief was not unreasonable since he and his attorney had "hope of success." Bean v. Broussard, 587 So.2d 908, 912 (Miss. 1991); Tricon Metals & Services, Inc. v. Topp, 537 So.2d 1331, 1336 (Miss. 1989). At the time that the lawsuit was filed, Pallatin did not know that the May 3, 1989, letter from Fankboner, Jones' father, existed. In that letter, Fankboner asked Jones to forgive him and to always remember that she is his daughter. As delineated in the facts, Pallatin became aware of this letter and other notes from Fankboner on the day of trial. We have stated that a "continuing duty of inquiry" is not part of Rule 11 test. Nationwide Mut. Ins. Co. v. Evans, 553 So.2d 1117, 1120 (Miss. 1989). "Filing ... triggers the possibility of sanctions." Id. quoting Miss.R.Civ.Pro. 11. Viewing a case as weak is not enough to say that it "was either brought to harass or it was without merit." Brown v. Hartford Ins. Co., 606 So.2d 122, 127 (Miss. 1992).
Pallatin contends that this was not a frivolous case and that it was not brought to harass the proponent. The presumption of undue influence, along with the suspicious circumstances surrounding the execution of the will, gave the contestant some "hope of success". Bean, 587 So.2d at 912. Because Jones maintained a confidential relationship with Fankboner, the burden was placed on Jones to prove by clear and convincing evidence that she did not exert undue influence or abuse the relationship. The record reflects an allusion to a settlement offer which Jones deemed frivolous, but no findings were made as to the timing or significance of this offer with respect to the chances of success at the time that the complaint was filed or at any other time.
Because substantial justification existed to support the filing of the complaint, and because there is no evidence that the claim was unnecessarily expanded or brought to delay or harass, we reverse and render the judgment as to sanctions.
AFFIRMED IN PART, REVERSED AND REMANDED IN PART, REVERSED AND RENDERED, IN PART.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, PITTMAN, McRAE, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
NOTES
[1] Fankboner executed three wills. On February 3, 1989, Fankboner executed his first Last Will and Testament in South Bend, Indiana. In this will, Fankboner bequeathed five dollars ($5.00) to his daughter, the appellee in this case, Kandy Jones, and five dollars ($5.00) to his son, Mark Fankboner. He left his grandson, Kandy Jones' son, Ezekiel Jones, twenty-five thousand dollars ($25,000). The appellant, Pallatin, was named as the personal representative and bequeathed two thousand five hundred dollars ($2,500). There were ten other bequests to friends and charitable organization ranging from one thousand dollars ($1,000) to fifteen thousand dollars ($15,000).

On August 9, 1989, Fankboner allegedly signed, while in Biloxi, Mississippi, a second will in which he divided his estate among his son, Mark, his daughter, Kandy, and friend, Barbara Champ. (This will is not at issue since the evidence was undisputed that Fankboner was delusional at the time that he signed this document).
On September 13, 1989, Fankboner executed his third will also in Biloxi, Mississippi. In this will, he bequeathed one-half of his estate to Kandy and one-half to his grandson.