# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 16, 2021

Lyle W. Cayce
Clerk

No. 20-60588

GREAT AMERICAN LIFE INSURANCE COMPANY,

*Plaintiff*,

*versus*

AVA MITCHELL TANNER,

*Defendant—Appellee*,

*versus*

ALITA MARGARET MITCHELL; CRAIG J. CHEATHAM,

*Defendants—Appellants*,

*versus*

PHYLLIS MITCHELL FERNANDEZ,

*Intervenor—Appellee*,

_____

AVA MITCHELL TANNER; PHYLLIS FERNANDEZ,

*Plaintiffs—Appellees*,

*versus*

No. 20-60588

ALITA CHEATHAM MITCHELL; CRAIG CHEATHAM,

*Defendants—Appellants*.

---

Appeal from the United States District Court
for the Northern District of Mississippi
USDC Nos. 3:16-CV-70 c/w 3:18-CV-23

---

Before SMITH, STEWART, and HO, *Circuit Judges*.

CARL E. STEWART, *Circuit Judge*:

In April 2016, Great American Life Insurance Company ("GALIC") filed an interpleader action seeking to determine the proper beneficiary of two annuities belonging to decedent Don Mitchell ("Don"). The district court granted summary judgment in favor of Don's daughter, Ava Tanner ("Ava"), rejecting the claims of Don's widow and stepson, Alita Mitchell ("Alita") and Craig Cheatham ("Craig"). Craig and Alita appealed. This court determined that material issues of fact existed, vacated the district court's summary judgment in favor of Ava, and remanded the case for trial. *See Great Am. Life Ins. Co. v. Tanner*, 766 F. App'x 82, 84 (5th Cir. 2019) (referred to herein as "*Tanner I*"). While those proceedings were pending, Ava and her sister, Phyllis Fernandez, filed another suit in 2018 claiming entitlement to other assets belonging to Don, including life insurance proceeds, an individual retirement account ("IRA"), and mineral rights. The two cases were consolidated for trial. After a three-day bench trial in July 2019, the district court again held in favor of Don's children, Ava and Phyllis, awarding them the GALIC annuities, the IRA, the life insurance proceeds, and the mineral rights. Craig and Alita filed this appeal. For the following reasons, we AFFIRM.

# I. Factual Background

Many of the facts giving rise to this appeal are detailed in our prior opinion. *See Tanner I*, 766 F. App'x at 84–86. For purposes of clarity, we will briefly summarize some of those facts here, along with other relevant facts from the record and the second lawsuit that Ava and Phyllis filed in 2018.

Don married his first wife Barbara Mitchell in 1963 and the two had three children—Ava, Phyllis, and Donice. In 1980, Donice passed away. In 1984, Don and Barbara divorced. In 1987, Don married his second wife, Earlene Cotton White, and they lived together in Heth, Arkansas, until Earlene's death in 2005. In 2007, Ava moved to Heth to be near Don. Ava has been medically disabled since 2001.

In 2011, Don began communicating with Alita Cheatham, the widow of one of his friends. Within a few weeks, Don began visiting Alita at her home in Horn Lake, Mississippi, and within months, the two began discussing marriage. That year, Don's health was declining, and Ava served as his caregiver during this time. In early 2012, Don had surgery to remove a cancerous spot from the side of his head. Shortly after Don's surgery, Ava traveled to Florida to care for her mother, who was also recovering from surgery. When Ava returned to Arkansas in August of that year, she discovered that Don's health had continued to steadily decline. Then, in November 2012, Don was diagnosed with lung cancer and began receiving chemotherapy and radiation.

In April 2013, Don retired from his job as a boat captain on the Mississippi River due to his poor health. He began struggling to keep up with his bills so he added Ava to his bank accounts so she could help him keep his financial affairs in order. When Don retired, he purchased two annuities from GALIC, then valued at $117,333.54 and $120,153.25, and named Ava as the

No. 20-60588

beneficiary. These two annuities were the focus of the interpleader suit that GALIC filed in April of 2016.

In March 2015, Ava left for Florida again to care for her mother. She took with her the information on the GALIC annuities, the receipt for Don's burial policy, and a checkbook. She called to check on Don regularly and offered to return to Arkansas in the summer of 2015, but Don and Alita told her that was not necessary. Around this time, Don and Alita's son Craig began discussing Don's finances. Don did not know how to find the accounts and investments that were in his name, nor did he know his account balances. He was also unsure where his trust account was located. Craig and Don went the following week to speak with an attorney in Little Rock about Don's trust. Don and Craig then went to Regions Bank ("Regions") to get a copy of his bank statements. Don told Craig that his accounts were missing tens of thousands of dollars. Bank officials told Don that he had active checking accounts in Alabama, Florida, and Arkansas. Don was confused by this information and told bank personnel that he was only aware of some bank accounts that he had in Arkansas. Don then closed all but one of his accounts. The record reflects that Don was upset that his accounts did not show the balances he expected, and he began to discuss with Craig the possibility that Ava had stolen money from him.

Days later, Don and Craig went to Regions to meet with the branch manager about Don's investments. There, Craig learned about the GALIC annuities. On August 14, 2015, Don signed forms revoking Ava's power of attorney and appointing Craig in her place. Don called his long-time attorney, Frank Dudeck ("Dudeck"), and asked his office to prepare the necessary forms. Craig went alone to Dudeck's office to retrieve the forms. Craig then faxed his newly executed power of attorney and Ava's revocation to GALIC and told them to freeze Don's accounts until they received further notice from Craig.

4

No. 20-60588

On August 17, 2015, Don returned to Regions with both Alita and Craig and made Alita the primary beneficiary of the GALIC annuities. Later that day, Don and Alita were married in a private ceremony. Don's children were not invited to the wedding. Shortly thereafter, Don made Craig the contingent beneficiary of the GALIC annuities. After Don and Alita were married, Alita changed Don's telephone number. Ava claims she was not given Don's new number and that she was prevented from contacting Don thereafter. Alita claims that she provided Don's new number to Ava.

According to Ava, on August 20th, Don called her on his speaker phone with Alita and Craig present and listening and demanded that she return approximately $200,000 that he believed was missing from his trust account. The following day, with Craig's assistance, Don removed Ava as beneficiary from his Prudential Life Insurance policy, then valued at approximately $184,000, and added Alita and Craig as beneficiaries to the policy. A few days later, again with Craig's assistance, Don signed a form designating Craig and Alita as beneficiaries of his Cetera IRA account valued at approximately $149,000. The following month, in Craig's presence, Don executed a new will, removed Ava as executor, and appointed Craig as the executor. The new will left all of Don's property to his trust account, of which Alita was the residual beneficiary. Don then made Alita the residual beneficiary of his mineral interests.[1] He then amended his trust to lower the bequests to Ava and Phyllis to $500 each. On December 1, 2015, Don died at the age of 81.

## II. Procedural History

In 2016, GALIC filed an interpleader suit to determine the proper recipient of the two annuities—Alita, Craig, Ava, or anyone else. All three

---

[1] The record does not contain a clear valuation of Don's mineral interests.

answered GALIC's complaint. Alita filed a crossclaim against Ava. Ava filed a crossclaim against Craig and Alita alleging that they had exerted undue influence over Don prior to his death to gain control of his assets and cut off his contact with his family. Ava also filed an amended crossclaim seeking to add the disputed Prudential Life Insurance proceeds, the Cetera IRA account funds, and the mineral interests to her original crossclaim against Alita and Craig. The district court, however, denied that motion and limited the 2016 suit to the GALIC annuities. For that reason, Ava and Phyllis filed a second suit in 2018 against Alita and Craig seeking to recover the funds from those additional assets. The district court then granted summary judgment in favor of Ava and awarded her the value of the GALIC annuities. In its opinion, the district court determined that the circumstances surrounding Don's decision to make Craig and Alita beneficiaries of the annuities gave rise to a rebuttable presumption of undue influence because Craig and Don had a confidential relationship and Craig was involved in the preparation of the challenged change-of-beneficiary forms. The district court concluded that Craig and Alita failed to provide sufficient evidence rebutting that presumption, thereby warranting judgment in favor of Ava.

Craig and Alita appealed, and this court vacated the district court's summary judgment and remanded for trial after determining that material fact issues existed as to whether Craig and Alita could rebut the presumption of undue influence. *See Tanner I*, 766 F. App'x at 84. As a preliminary matter, the *Tanner I* panel agreed with the district court that a presumption of undue influence existed due to Craig and Don's confidential relationship and Craig's active involvement in changing the beneficiaries of Don's annuities. The court paused there, however, noting that material fact issues existed as to whether: (1) Craig acted in good faith, (2) Don acted with knowledge and deliberation of his actions and their consequences when he removed Ava as beneficiary of the annuities and added Alita and Craig, and (3) Don exhibited

independent consent and action in changing the beneficiaries of the annuities, *i.e.*, whether Don obtained independent advice from disinterested parties before making the beneficiary changes to the annuities.

In July 2019, less than four months after remand from this court, the district court held a three-day bench trial on all pending issues between the parties. The court consolidated for trial the 2016 GALIC interpleader suit with Ava and Phyllis's 2018 lawsuit alleging claims involving the Prudential Life Insurance policy proceeds, the Cetera IRA funds, the disputed mineral interests, and a claim under the Mississippi Vulnerable Persons Act ("MVPA"). In March 2020, the district court issued an opinion and final judgment in favor of Ava and Phyllis on all claims except their MVPA claim which was dismissed. *See Great Am. Life Ins. Co. v. Tanner*, No. 3:16-CV-70, DMB-JMV, No. 3:18-CV-23-DMB-JMV, 2020 WL 1541375 (N.D. Miss. Mar. 31, 2020).

Ava and Phyllis filed a motion to amend requesting that the district court incorporate the dollar amounts into the final judgment and order Craig to convey the mineral interests back to Ava and Phyllis. The court granted in part and denied in part the motion and issued two amended judgments addressing the issues raised in the motion. Relevant here, the district court's Second Amended Final Judgment voided all changes of beneficiaries that were the subject of the consolidated suits for undue influence. It then awarded to Ava and Phyllis the value of the Prudential Life Insurance policy ($186,000) and the mineral interests to split equally, with the mineral interests to be transferred to them by Craig. It awarded to Ava the value of the Cetera IRA account ($148,504.14) and the value of both GALIC annuities ($228,486.79). The district court specified in its judgment that Craig and Alita were jointly and severally liable for restitution of the funds from the Prudential Life Insurance policy and the Cetera IRA account. The Clerk of Court was directed to pay Ava the amount of the GALIC annuities on deposit

with the court, including interest, the payment of which would apply toward the amount of the judgment against Craig. Craig and Alita filed this appeal.

## III. Standard of Review

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed *de novo*." *Deloach Marine Servs., L.L.C. v. Marquette Transp. Co., L.L.C.*, 974 F.3d 601, 606 (5th Cir. 2020) (citation omitted). Mixed questions of law and fact are reviewed de novo. *Rivera v. Kirby Offshore Marine, L.L.C.*, 983 F.3d 811, 816 (5th Cir. 2020) (citation omitted). "[W]e will upset the district court's findings of fact only if we are left with the definite and firm conviction that a mistake has been committed." *Deloach Marine Servs.*, 974 F.3d at 606–07 (alteration in original) (citation omitted). We afford even greater deference to the district court's findings when they are based on credibility determinations. *Id.* at 607. "[W]e employ a strong presumption that the court's findings must be sustained even though this court might have weighed the evidence differently." *Id.* (citation omitted).

## IV. Discussion

Neither party disputes on appeal that Mississippi law applies in these proceedings. Appellants Craig and Alita advance five primary arguments on appeal: (1) the district court improperly imposed a burden of clear and convincing evidence as to Alita; (2) the district court erred in imposing a requirement that Appellants must prove that Don received independent advice from a disinterested third party before making the beneficiary changes to his policies and accounts; (3) the district court improperly based damages on a theory of unjust enrichment which was neither pled nor proven; (4) the district court erred in imposing joint and several liability on Appellants; and (5) the district court improperly entered a judgment relating to the

disposition of real property in Arkansas which is in the exclusive jurisdiction of the Arkansas probate courts. We address each of these arguments in turn.

*(1) Clear and Convincing Evidence Burden & (2) Independent Advice from Third Parties*

Appellants argue that the district court improperly imposed a burden of clear and convincing evidence on Alita because there was no evidence that she unduly influenced Don. They further argue that the district court erred in requiring them to show that Don received independent advice from disinterested third parties before making the challenged beneficiary changes. We disagree.

Under Mississippi law, a litigant may establish a rebuttable presumption of undue influence where: "(1) a confidential relationship exists between the testator and a beneficiary, and (2) the beneficiary in the confidential relationship was actively involved in some way with preparing or executing the [testamentary instrument]" or inter vivos gift. *Noblin v. Burgess*, 54 So. 3d 282, 288 (Miss. Ct. App. 2010); *see also Madden v. Rhodes*, 626 So. 2d 608, 618 (Miss. 1993) (extending the undue influence rule to inter vivos gifts). "[T]here must be some showing that [the beneficiary] abused the relationship either by asserting dominance over the testator or by substituting [his or] her intent for that of [the testator]." *In re Will of Wasson*, 562 So. 2d 74, 78 (Miss. 1990). "Suspicious circumstances surrounding the creation of the [testamentary instrument or inter vivos gift] also raise the presumption." *In re Last Will & Testament & Estate of Smith*, 722 So. 2d 606, 612 (Miss. 1998). "[O]nce the required showing is made to raise the presumption of undue influence, the burden shifts to the proponents to rebut the presumption by clear and convincing evidence." *Noblin*, 54 So. 3d at 288.

No. 20-60588

### A. Undue Influence: Craig

In analyzing the issue of undue influence, the district court considered testimony from several witnesses put on by both sides. Based on its assessment of the credibility of the witnesses, the applicable law, and the whole of the evidence, the district court determined that Craig exerted undue influence over Don. The record clearly supports that a confidential relationship existed between Craig and Don, Craig was undisputedly a beneficiary of each asset except the trust, and that Craig actively participated in each challenged change to the beneficiary designations. While the district court did not require evidence relating to disinterested third parties, it did require some form of clear and convincing evidence from which it could conclude that the transfers were Don's true, untampered, intent. With respect to the disinterested third party evidence that was presented, the district court observed that there was "simply no evidence that Don was acting on the advice of a competent person disconnected from him with respect to any of the changes at issue in these cases." It noted that, although the record reflected that Don had interacted with numerous individuals in making the challenged changes, the interactions were limited to simple confirmations from these individuals that Don wanted to make each decision. Our review of the record supports the district court's analysis. Four witnesses testified via video deposition and two witnesses appeared at trial. We briefly summarize the relevant portions of each witness's testimony here.

### (a) Dr. Rhonda Gentry (Don's Physician)

Dr. Gentry testified via video deposition and did not appear at trial. When asked whether she thought Don was able to act independently and make his own decisions, Dr. Gentry replied, "[r]egarding his ability to participate in his medical care, yes." When asked if she "[knew] anything beyond that" and she answered, "I don't." When asked whether she

believed Don's judgment was affected by his fatigue and anemia, she replied, "not in our relationship regarding his medical care."

Dr. Gentry did not testify as to Don's capacity to make the specific beneficiary changes at issue on appeal and she cabined the applicability of her responses to his decisions affecting his medical care. Thus, her testimony did not constitute "clear and convincing" evidence to rebut the presumption of Craig's undue influence over Don with respect to the challenged beneficiary changes.

### (b) Scottie Lactland (Branch Manager for Regions Bank)

Lactland also testified via video deposition and did not appear at trial. During Lactland's deposition, he not only had trouble remembering specific meetings with Don, he had trouble remembering who Craig and Alita were or when they accompanied Don to certain meetings. Lactland was able to vaguely remember that Don mentioned that he thought his daughter was stealing from him and that he wanted her removed from his accounts. When asked whether he made the beneficiary changes Don requested, Lactland replied, "[a]bsolutely, yes, I did." But when questioned as to whether he discussed the disputed beneficiary changes with Don, Lactland replied, "I don't recall if he explained it, but I know that he mentioned he wanted to change his beneficiary."

Lactland's deposition testimony confirms that he made the beneficiary changes immediately after Don requested that they be made without advising or questioning Don or discussing any details with him. Lactland's testimony did not constitute "clear and convincing" evidence to rebut the presumption of Craig's undue influence over Don.

No. 20-60588

### (c) Phyllis Harden (Don's Former Co-worker)

Harden testified via video deposition and did not appear at trial. When asked whether she and Don discussed the beneficiary changes, Phyllis responded:

> He did not go into detail, but he indicated that he had a daughter that had taken advantage of him on some 401(k) money . . . I didn't ask details on that. I did not ask. I mean, that was not any of my business . . . I didn't really ask him questions about why he wanted the forms . . . the rest of our conversation was mainly about work, different things. But no, I did not question him why he's doing what he's doing or are you sure.

Harden's deposition testimony reveals that she, like Lactland, simply confirmed that Don wanted to make the beneficiary changes in question. She did not advise or question Don or talk to him about his motives behind making the changes. She did not feel that the details of the beneficiary changes were any of her business. This is not "clear and convincing" evidence that would rebut the presumption of Craig's undue influence over Don.

### (d) Terry Greene (Former Regions Employee)

Greene testified at trial. He recounted that, because he didn't know Don, he spoke to him a little longer, but he could not remember many of the details of their conversations. He could not remember whether Craig made the appointment or if Craig and Alita accompanied Don to the appointment. Greene testified that he did not give Don advice about the disputed beneficiary changes because Don had already made up his mind prior to arriving at Greene's office. This is not "clear and convincing" evidence to rebut the presumption that Craig unduly influenced Don.

12

### (e) Stephen Jones (Legal Assistant at Frank Dudeck's Law Firm)

Jones did not appear at trial but testified via video deposition. Jones testified that, from his memory, Don "was fine" when he signed the trust and other related documents, but he could not remember why Don amended the trust. Jones was able to remember that Craig accompanied Don to a meeting, but he wasn't sure exactly why Don wanted to meet. He thought it could have been about his IRA or his 401(k). He remembered that Craig talked as often as Don did, but he could not remember the details of what they spoke about. Jones was asked about other meetings with Don and Craig but could not remember the details of those meetings either except that they requested the changes that were made. Nothing Jones testified to qualifies as "clear and convincing" evidence to rebut the presumption that Craig unduly influenced Don.

### (f) Tarishan Winder (Notary)

Winder testified very briefly at trial. She recalled that Don, Craig, and Alita were all present at least once when she notarized Don's trust. When asked if it appeared as if anyone was exerting any influence or intent over Don, Winder responded "I didn't perceive that." When asked whether she discussed the substance of any of the documents with Don before notarizing them, Winder replied "No, I didn't go into details. Typically, whenever someone put[s] a document before me, I ask them to tell me what the document is and are they sure this is something they want to sign and notarize. So we didn't go into details about anything." Winder's testimony was unremarkable and did not amount to "clear and convincing" evidence that would rebut the presumption of Craig's undue influence.

We conclude that the district court's decision to minimize the probative weight of the testimony of these six witnesses was reasonable and supported by the record. Each witness simply confirmed that Don wanted to

make the beneficiary change at issue and then proceeded as directed. Consequently, we agree with the district court that Craig failed to produce clear and convincing evidence to rebut the presumption that he unduly influenced Don with respect to the challenged beneficiary designations.

In *In re Fankboner*, another will contest suit, the Mississippi Supreme Court held the disputed bequest to be valid. 638 So. 2d 493, 497 (Miss. 1994). There, a father chose to leave half of his estate to his biological daughter after declaring in a letter months earlier that he wanted her forgiveness. *Id.* at 494 n.1. Several witnesses testified that he privately divulged to them his reasons for changing his will weeks prior to signing the amended instrument. *Id.* at 495–96. The court concluded that "clear and convincing evidence" of Fankboner's independent consent and action existed because "the evidence is replete with statements that Fankboner acted independently of [his daughter]." *Id.* at 496–97.

Here, there is no evidence that Don discussed his reasons for changing beneficiaries with anyone, only that he occasionally declared that he thought Ava might be stealing from him. Additionally, the evidence in this case is not "replete with statements" that Don acted independently of Craig. The record confirms that Don rarely, if ever, acted independently of Craig and that Craig made at least half a dozen two-hour trips to accompany Don to make financial decisions that benefited himself or his mother. Further, there is no evidence in the record here, as there was in *Fankboner*, that Don was able to have private conversations with anyone outside of Craig's presence or that he discussed the substance of the beneficiary changes with anyone before making them.

The record reveals that, near the time that Craig began escorting Don to make the beneficiary changes, Don could no longer communicate with his own family. His cellphone number was changed and allegedly kept private.

No. 20-60588

Additionally, the overt hostility that Craig displayed toward Ava in their written communications was disturbing at best. None of these facts existed in *Fankboner*. Further, the disputed bequest in *Fankboner* was reasonable—a father chose to leave half of his estate to his biological daughter after declaring in a letter months earlier that he wanted her forgiveness. But here, it seems puzzling that Don would choose to leave nearly everything he owned to two people he had only known for a few years and who became aggressively close to him just prior to his death while he was battling cancer.

After reviewing the evidence presented at trial, the district court held that "the transfers of the [a]ssets . . . [that] Phyllis and Ava argue were improper must be deemed void." As discussed above, Mississippi law supports this conclusion. *Id.* at 495 (observing that if there is no "substantial evidence, either from the circumstances, or from a totally disinterested witness from which the court can conclude that the transfer instrument represented the true, untampered, genuine interest of the grantor . . . . then as a matter of law the transfer is voidable" (internal quotation marks and citation omitted)). The district court's finding of undue influence as to Craig is amply supported by the record. Appellants' claims are without merit.

### B. Undue Influence: Alita

The district court then concluded that the trial record was insufficient to raise a presumption of undue influence as to Alita so the undue influence claims against her failed. Given this conclusion, the district court did not, as Appellants contend, impose a burden of clear and convincing evidence on Alita. It did, however, point to its previously entered pretrial order identifying "as a contested issue of law whether '[i]f Alita Mitchell is not found to have unduly influenced Don, can she nevertheless be liable for damages for any undue influence asserted by her son Craig that benefited her.'" The court noted that "[t]his unambiguous reference to seeking

15

recovery even in the absence of undue influence was sufficient to place Alita on notice that Phyllis and Ava intended to seek recovery from Alita of the assets subject to Craig's undue influence." The district court continued that, under Mississippi law, "a recipient of money paid by mistake must make restitution to the owner of the money unless the recipient [detrimentally relied] on receipt of the funds." *See U.S.F. & G. Co. v. Newell*, 505 So. 2d 284, 287 (Miss. 1987). It concluded that, because it had definitively found undue influence on the part of Craig and the necessary voiding of transfers, it could not be disputed that Alita had received the Prudential Life Insurance policy proceeds and the Cetera IRA funds by mistake. Further, because there was no evidence that Alita detrimentally relied on the receipt of these funds, she was obligated to make restitution to Phyllis and Ava for their value. Mississippi law again supports the district court's analysis. *See Newell*, 505 So. 2d at 287 ("The insurer is entitled to a directed verdict for restitution of money the insurer paid by mistake unless the insured can show that he significantly changed his position relying on the overpayment making it inequitable to require him to return the money."). Appellants' arguments to the contrary are meritless.

*(3) Damages*

Next, Appellants argue that the district court erred in awarding damages against Craig based on a theory of unjust enrichment because he does not have possession of the assets at issue. We disagree. The record reflects that the damages assessed against Craig by the district court were actually based on its conclusion that Craig exerted undue influence over Don prior to his death, not based on a theory of unjust enrichment. The district court's July 2020 order on Ava and Phyllis's motion to amend the final judgment states "unlike the concept of restitution, damages for undue influence, which 'comprehends fraud,' necessarily depend on the value of the property lost, not the enrichment of the defendant." It continued, "Craig

is liable for the value of the funds lost as a result of his undue influence[.]" The district court's Second Amended Final Judgment directed the Clerk of Court to pay Ava the amount of the annuities on deposit with the court, and provided that such payment "shall apply towards the amount of the judgment against Craig Cheatham as to the value of the annuities awarded."

The record is clear that the district court did not award damages based on a theory of unjust enrichment. It awarded damages based on a finding of undue influence on Craig's part. Additionally, the damages assessed against Craig with respect to the GALIC annuities were satisfied by the district court's direction to the Clerk of Court to pay Ava the amount of the annuities on deposit with the court. Appellants' arguments on these issues are wholly meritless and unsupported by the record.

*(4) Joint and Several Liability*

Appellants next argue that the district court erred in holding them jointly and severally liable for the GALIC annuities, the Prudential Life Insurance policy, and the Cetera IRA account. We are unpersuaded.

As a preliminary matter, the district court's Second Amended Final Judgment and its July 2020 order on Ava and Phyllis's motion to amend the final judgment provide that Craig and Alita are jointly and severally liable for only the Cetera IRA account and the Prudential Life Insurance policy funds—not the GALIC annuities. Citing the Restatement of Restitution, the district court determined that, because the claims against Craig and Alita were founded on a single deprivation, the loss of the transferred assets, joint and several liability is appropriate. We agree. As the district court observed, the Restatement of Restitution provides:

> Where a claim against two persons is founded upon a single deprivation as it is where a tort resulting in a single harm has been committed by

> two persons concurrently or acting in co-operation, the injured person, while having a cause of action against each of the parties for the entire amount of injury, is entitled only to one satisfaction. If he obtains judgment against one and it is satisfied, he thereby loses his claim against the other.

Restatement (First) of Restitution § 147 cmt. d (1937). The district court correctly reasoned that this part of the Restatement "effectively imposes joint and several liability on a restitution defendant when the action is founded 'upon a single deprivation.'" *See also City of Jackson v. Estate of Stewart ex rel. Womack*, 908 So.2d 703, 711 (Miss. 2005) ("This Court recently held 'that "[t]here can be but one satisfaction of the amount due the plaintiff for his damages". . . Thus, double recovery for the same harm is not permissible.'" (quoting *Medlin v. Hazlehurst Emergency Physicians*, 889 So.2d 496, 500–01 (Miss. 2004))). Further, the district court correctly declined to hold that Appellants were liable in tort, under Mississippi statutory law, or under the indivisible injury doctrine.[2]

The district court's analysis on this issue makes clear that its imposition of joint and several liability on Craig and Alita with respect to the Prudential Life Insurance policy proceeds and the Cetera IRA account funds was, at least in part, to prevent Appellees from obtaining a double recovery. This is a purpose intended to benefit Appellants, not cause their detriment as they contend. Moreover, Appellants' argument that joint and several liability should not apply because "the [c]ourt stated that the Appellees had

---

[2] *See D & W Jones, Inc. v. Collier*, 372 So. 2d 288, 294 (Miss. 1979) (discussing the indivisible injury doctrine, the court held "that the separate, concurrent and successive negligent acts of the appellees which combined to proximately produce the single, indivisible injury to appellant's property . . . rendered appellees jointly and severally liable").

No. 20-60588

not proven an act of undue influence on Craig Cheatham's part and that his actions might have been justified" is utterly false and completely contradicted by the record.

The district court did not err in imposing joint and several liability on Craig and Alita with respect to the Prudential Life Insurance policy and the Cetera IRA account.

*(5) Disposition of Real Property in Arkansas*

Finally, Appellants argue that the district court erred in entering a judgment related to the disposition of real property in Arkansas, *i.e.*, the disputed mineral interests, because doing so was within the exclusive jurisdiction of the Arkansas probate courts. We disagree.

This court has acknowledged the Supreme Court's doctrine set forth in *Fall v. Eastin* "that a court has no jurisdiction over realty located in another state and that any decree purporting to have an in rem effect on such foreign realty is void, thus relieving the situs state of any obligation to recognize that judgment under principles of Full Faith and Credit." *Allis v. Allis*, 378 F.2d 721, 723–24 (5th Cir. 1967) (citing *Fall v. Eastin*, 215 U.S. 1, 6–8 (1909)). The court, however, stated that:

> [An] exception to this doctrine is that a court having in personam jurisdiction over a litigant may indirectly act upon realty situated in another jurisdiction by means of an equitable decree directing that party to convey title to the foreign realty to another. If the court, having properly acquired such personal jurisdiction over the party before it, enforces its decree by compelling a conveyance . . . such conveyance is entitled to Full Faith and Credit in the situs state.

*Allis*, 378 F.2d at 724 (footnote omitted) (citing *Fall*, 215 U.S. at 8). The court may not, however, "transfer title in the other state." *Adar v. Smith*, 639 F.3d 146, 159 (5th Cir. 2011).

Here, because the district court had personal jurisdiction over Craig, it had authority to declare the transfer of the mineral interests void for undue influence. We further agree with the district court that "irrespective of the location of the mineral interests," it had "authority to declare the transfer of the mineral interests void for undue influence and the authority to direct Craig to convey the interests [back] to Phyllis and Ava." *See In re Fankboner*, 638 So. 2d at 495. Moreover, the district court modified its order and judgment to make clear that it was limited to an equitable decree ordering Craig to convey the mineral interests back to Ava and Phyllis and not transferring title to the mineral interests. *See Adar*, 639 F.3d at 159.

The district court did not err in ordering Craig to convey the improperly obtained mineral interests back to Ava and Phyllis.

## V. Conclusion

For the foregoing reasons, the district court's judgment is AFFIRMED.