# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-CA-00778-SCT

*IN THE MATTER OF THE ESTATE OF BENNIE LOYD SMITH, DECEASED: TYREE IRVING AND ETHOLA IRVING*

*v.*

*HALLIE PHILLIPS STREATER*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/23/2000 |
| TRIAL JUDGE: | HON. JOHN C. LOVE, JR. |
| COURT FROM WHICH APPEALED: | CARROLL COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | EVERETT T. SANDERS |
| ATTORNEY FOR APPELLEE: | LUKE J. SCHISSEL |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 06/20/2002 |
| MOTION FOR REHEARING FILED: | 8/12/2002; denied 10/10/2002 |
| MANDATE ISSUED: | 10/17/2002 |

**EN BANC.**

**PITTMAN, CHIEF JUSTICE, FOR THE COURT:**

¶1. Bennie Loyd Smith died at the distinguished age of 100 on March 28, 1997. Eleven days later, Tyree Irving filed a petition to probate a will dated February 1, 1997, in the Chancery Court of the Second Judicial District of Carroll County, attesting that it was Smith's last testament. Irving was appointed executor of the estate and issued letters of administration. Four days after Irving's petition, Hallie Phillips Streater filed a writing she claimed to be Smith's last testament dated March 26, 1996, in the Chancery Court of the First Judicial District of Carroll County. She was appointed executrix of the estate and issued letters of administration. When this competing will was discovered, the chancellor quashed Streater's letters of administration, consolidated the two cases, and treated the action as a contest of the validity of the February 1 will. The chancellor issued an opinion finding a confidential relationship existed between Smith and Irving giving rise to a presumption of undue influence; the presumption was not rebutted by Irving by clear and convincing evidence; and therefore the February 1 will was not the last testament of Bennie Smith. Irving now appeals this ruling. We affirm the trial court's judgment, finding the chancellor's opinion to be solidly grounded in fact and his analysis of the issues to be thorough and well-reasoned. We quote from his

opinion at length and adopt the trial judge's opinion as the opinion of this Court.

## FACTS

¶2. The trial court found the following:

> This is an action to contest the validity of a will dated February 1, 1997, executed by Benny Lloyd Smith who was, at that time, ninety-nine years of age. At the time, Mr. Smith had no children and no brothers or sisters who were living. His nearest relatives were some nieces and nephews and many great or great-great nieces or nephews. The evidence does not indicate that Mr. Smith had a will prior to March 27, 1996. On that day, he executed a will prepared by Pat Barrett leaving his estate to a great-niece, Hallie Streater. On May 3, 1996, he executed another will prepared by Tyree Irving, by which he left a number of specific bequests to a variety of friends and relatives with the residue and bulk of the estate to Dorothy Gaston, who was not a relative, and her children. On May 22, 1996, he executed another will prepared by Tyree Irving in which he added a beneficiary to the May 3 will and added a statement about why he was not leaving any assets to Hallie Streater. On February 1, 1997, he executed his fourth will in which he made some specific bequests, but less than in the May will, and then left the residue of his estate to Tyree Irving, who he had only known for eight months, having first met him on May 3, 1996, and his wife, Ethola. This will was prepared by Solomon Osborne. The contestant in this action is Hallie Streater, the beneficiary of the March 1996 will. The Court has previously ruled that any contest of the wills would have to be tried separately since the issues and party's positions would be different with each and that the most recent will would have to be contested first for if it is valid, there would be no necessity to deal with the other previous wills. Further, the evidence revealed a number of inter vivos gifts between May 1996, and February 1, 1997, and the Court's position is that only the beneficiary of a valid will or his heirs at law, if there is no valid will, could challenge these gifts. Thus, the validity of the gifts cannot be addressed until the validity of the wills is resolved. Hallie Streater, the beneficiary of the first will, is the only contestant, but all the beneficiaries of the last three wills and all the heirs have been made parties since they are all interested parties and are necessary parties under the will contest statute.

After hearing the evidence, the chancellor concluded that the February 1, 1997, will was indeed the product of undue influence placed upon Smith by Irving. He therefore entered an order revoking the probate of the February 1 will. Irving offers us three issues for review.

**I. WHETHER THE TRIAL COURT ERRED IN CONCLUDING THAT A PRESUMPTION OF UNDUE INFLUENCE AROSE FROM TYREE IRVING'S RELATIONSHIP WITH MR. SMITH.**

**II. WHETHER, ASSUMING THE EXISTENCE OF A PRESUMPTION OF UNDUE INFLUENCE, THE TRIAL COURT USED AN ERRONEOUS LEGAL STANDARD FOR DETERMINING WHETHER THE PROPONENTS, TYREE AND ETHOLA IRVING, OVERCAME THE PRESUMPTION.**

**III. WHETHER, ASSUMING THE EXISTENCE OF A PRESUMPTION OF UNDUE INFLUENCE, THE TRIAL COURT'S CONCLUSIONS THAT THE PROPONENT'S PROOF FELL SHORT OF THE LEGAL REQUIREMENT TO OVERCOME THE PRESUMPTION OF UNDUE INFLUENCE WAS MANIFESTLY WRONG OR**

**CLEARLY ERRONEOUS.**

<u>**STANDARD OF REVIEW**</u>

¶3. A chancellor's findings of fact will not be disturbed unless they are manifestly wrong or clearly erroneous, or unless the chancellor applied an erroneous legal standard. ***Estate of Grantham v. Roberts***, 609 So. 2d 1220, 1223 (Miss. 1993). Reversal is not warranted by this Court if the chancellor's findings are supported by substantial, credible evidence which support the findings. ***[Estate of Grubbs v. Woods](#)***, 753 So. 2d 1043, 1046 (Miss. 2001).

<u>**DISCUSSION**</u>

¶4. To begin our analysis of each issue, we resume with the chancellor's opinion:

> At the inception of the trial, the proponent of the will introduced the will and the proofs of will filed with it with the Clerk and the order admitting it to probate. With this introduction, the proponents made a prima facie case of the validity of the will. In <u>Re: Estate of Smith</u>, 722 So.2d 606; In <u>Re: Estate of Edwards</u>, 520 So.2d [1370,] 1372; <u>Harris v. Sellers</u>, 446 So.2d 1012.

> In her contest of the will, Hallie Streater alleges that Benny Lloyd Smith lacked the mental capacity to make a will on February 1, 1997, and that the February 1, 1997, will was a result of undue influence. This Court will address these two issues separately.

> In connection with the execution of the wills on May 3, 1996, May 22, 1996, and February 1, 1997, portions of the proceedings were videotaped. From the videos, much can be seen about Mr. Smith. They reveal that Mr. Smith clearly knew who his relatives and natural objects of his bounty were. He was able to relate the names of his brothers and sisters, nieces, nephews, and many of his great nieces and nephews and was able to provide specific data about them. He was able to give a detailed and specific reason why he wanted to leave nothing to his one stepchild. He had specific reasons for some of the specific bequests contained in the will. All of the parties involved in the preparation of the will on February 1, 1997, were of the opinion that he was competent and understood what he was doing on the day that he signed the will. For the February 1 will, there were two separate meetings with Mr. Osborne and videos were made on both days. Both of these reveal that he was aware of the facts on both of those occasions. In <u>Estate of Edwards</u>, 520 So. 2d 1320 [1372], the Court stated the requirements for determining competency to make a will as follows:

> "Consistently, this Court has held that the test of one's capacity to execute a will, 'is the ability of the testator at the time to understand or appreciate the nature and effect of his act, the natural objects or persons to receive his bounty and their relationship to him, and is capable of determining what disposition he desires to make of his property.' Such capacity,' is to be tested as of the day of the execution.'"

> There was testimony by witnesses for the contestant that, at times, Mr. Smith was confused, but none of this reflects his condition on February 1, 1997. In light of these requirements for determining competence from the evidence and in particular the videos, this Court is of the opinion that Mr. Smith had the mental capacity on February 1, 1997, to execute a valid will.

> Having determined that Mr. Smith had the capacity to execute a will, the Court will now address the

matter of undue influence. In doing so, the Court must first state there is no direct evidence that Tyree or Ethola Irving ever exerted any undue influence over Benny L. Smith. The Court's [sic] of the State have recognized that there is seldom ever any direct proof of undue influence since it usually occurs when no one else is present and it is accomplished in a subtle way. Croft v. Adler, 115 So.2d [683,] 686. Since this is usually the case the Supreme Court has created a presumption of undue influence that arises in certain situations as is set out in the cases hereinafter cited. This being true, the Court must determine whether the presumption applies to the facts here. In May 1996, Tyree Irving, an attorney, began providing legal services for Mr. Smith for, during that month, he prepared two wills for him. In September 1996, Mr. Irving began helping Mr. Smith in his dealings with his bank relative to discrepancies he thought existed in his bank account. During the period from May 1996-January 1997, Mr. Smith regularly visited Mr. Irving's office, and Mr. Irving began frequently visiting Mr. Smith at his home. In December 1996, Mr. Irving had more dealings with the bank about Mr. Smith's account, and in January 1997, Mr. Smith gave $22,000.00 to Mr. Irving's wife and daughter, mother and mother-in-law, and later in that month, gave Mr. Irving $10,000.00. When the idea of leaving his estate to Mr. and Mrs. Irving came up, Mr. Irving referred Mr. Smith to another lawyer for the preparation of that will, but after that referral, Mr. Irving continued to have his name on Mr. Smith's bank account. On the February 1, 1997, video, Mr. Smith refers to Mr. Irving as his attorney. Clearly, the attorney-client relationship is a fiduciary one, and the Court is of the opinion that when Mr. Irving permitted his name to be put on Mr. Smith's bank accounts, that too created a fiduciary relationship. Mr. Irving argues that, when Mr. Osborne started work for Mr. Smith, that his fiduciary relationship with him ended. This Court does not find that to be the case. Clearly, there continued to be a relationship by Mr. Smith with Mr. Irving, and Mr. Smith continued to consider Mr. Irving his attorney. The fact that Mr. Smith was using two attorneys would not alone cause the fiduciary relationship to end. This Court, thus, finds that on February 1, 1997, there existed a fiduciary relationship between Mr. Smith and Mr. Irving.

The case law in this state establishes that there is a presumption of undue influence where there is a bequest by a testator to one in a fiduciary relationship with him if the fiduciary has any involvement in the preparation of the will, Estate of Smith, 772 [722] So. 2d 606; Will of Fankboner Boner [sic], 638 So. 2d 493; Simms vs. Adams, 529 So. 2d 611; Mullins v. Ratliff, 515 So. 2d 1183.

Here, Mr. Irving obviously knew that if he and his wife were to be beneficiaries of the will, he could not prepare it, so he contacted Mr. Osborne, a friend and fellow Greenwood attorney, and made an appointment for Mr. Smith to see Mr. Osborne. He then carried his video equipment to Mr. Osborne's office and set it up so that the session could be videoed. He then carried Mr. Smith to Mr. Osborne's office and picked him up after the session. Thus, there is not only a fiduciary relationship by the beneficiary but active participation in arranging for the will to be prepared. With these facts, the Court finds that the presumption of undue influence exists in this case, and the burden is on Mr. Irving to show that the presumption has been rebutted. He is required to present clear and convincing evidence to overcome this presumption, Will of Fankboner, Supra; Madden vs. Rhodes, 626 So. 2d 608; Will of Adams, 529 So. 2d 611; Murray vs. Laird, 446 So. 2d 575.

In addressing transfer to fiduciaries is Hendricks v. Jones, 421 So.2d 1031, the Court said:

"the Law watches with the greatest jealousy transactions and dealings between persons occupying a fiduciary relationship in which the person in a position of influence receives some substantial benefit.

The law will not permit them to stand unless the circumstances demonstrate the fullest deliberation on the part of the dependant party, and the most abundant good faith on the part of the dominant party." *Croft*, 115 So.2d 683.

In further addressing proof requirements where there is a presumption of undue influence, in *Madden, Supra*, the Court said:

"The law requires the beneficiary to prove other than from himself that the gift was in truth and fact what the giver wished and not the result of any undue influence or improper action by the beneficiary---Put more simply, when a Court of Equity is faced with a large gift to a dominant party by the weaker in a confidential relationship, it must hear from someone besides the beneficiary or receive clear and convincing evidence beyond that of the lips of the beneficiary, that is, in truth and in fact what the donor wished to do on his own."

In 1984, in the case of *Murray vs. Laird, Supra*, the Court spelled out a three-prong test to be used to determine whether the presumption of undue influence had been rebutted. The prongs of the test stated in it are as follows:

(1)good faith on the part of the grantee/beneficiary

(2) the grantor's full knowledge and deliberation of the action and the consequences

(3) advice of (a) a competent person (b) disconnected from the grantor and (c) dedicated wholly to the grantor/testator's interest

Then three years later, in Mullins vs. Ratliff, 515 So. 2d 1183, it modified the third prong of the test, stating that proof of "independent consent and action is the appropriate third prong of the test."

In *Estate of Smith, Supra*, the Court fleshed out more details of the three prong test as follows:

"1. The beneficiaries must have acted in good faith. a. who initiated the procurement of the will? b. where was the will executed and in whose presence? c. what consideration was paid? d. who paid the consideration? e. was there secrecy or openness in the execution?

2. The testatrix must have had full knowledge and deliberation in the execution. a. Was the testatrix aware of her total assets and their general value? b. Did the testatrix understand who her natural inheritors were? c. Did the testatrix understand how the change would legally affect prior wills? d. Did the testatrix know that non relative beneficiaries would be included? e. Did the testatrix know who controlled her finances and by what method?

1. How dependent is the testatrix on those handling her finances? 2. How susceptible is she to influence by those handling her finances? 3. The testatrix must have exhibited independent consent and action.

Having determined what is required to rebut the presumption, the facts must be applied to the test. In March 1996, when Benny L. Smith executed his first will, he was ninety-nine years old, was still living in his home alone and able to drive himself, prepare some food, and to attend to his own business affairs. At that point, a great-niece, Hallie Streater, and her husband and some neighbors were visiting

him regularly and attempting to help meet his needs. They would contact him almost daily and bring him prepared food regularly. In March, he fell twice and was unable to get up by himself. On both occasions, he remained in [sic] the floor for some time until a friend came by and helped him up. Following these events, Hallie Streater attempted to take him to the doctor in Lexington, but the doctor was not in. She, then, carried him to Pat Barrett's office where he executed his first will. In the videos made in May 1996, and January and February 1997, Mr. Smith indicates that Hallie Streater had the will prepared as she wanted it and that it was not in accord with his desires. He, however, did sign it while Hallie had him in Lexington. The video indicates that, though he had many nieces and nephews or great-nieces and nephews, he was not close to any of them unless it was Hallie Streater. He became acquainted with Dorothy Gaston, who lives in Lexington and had two children. They developed some type of social relationship, and the evidence reveals that he attempted to get her to marry him. At some point, he asked her about a lawyer, and she referred him to Tyree Irving. In May, he went to Mr. Irving and had his second will prepared. In it, Dorothy Gaston and her two children are the principle beneficiaries, though he does make other specific bequests to friends and relatives. In it, he leaves nothing to Hallie Streater. On May 22, he had Mr. Irving prepare another will, again making Ms. Gaston and her children the principle beneficiaries and leaving Hallie Streater out. From this will and the videos, the Court finds that Mr. Smith had become upset by the action Mrs. Streater took in having the March will prepared leaving everything to her, and because of this hostility over her action in that regard, he did not want her to take anything.

While executing the wills in Mr. Irving's office, he met Trina Nichols, who was then age twenty six. He gave her and Mrs. Ethola Irving each five-hundred dollars for witnessing his will. From that point, he showed interest in Ms. Nichols, and she showed interest in him. She made numerous trips to his house, and at some point, after May 1996, he lost interest in Ms. Gaston. His interest in Ms. Nichols developed to the point that he asked her to marry him. In December 1996, he drew $15,000.00 in cash out of the bank and went to Jackson with Ms. Nichols where he bought her a truck for over $12,500.00. Mr. Irving testified that Mr. Smith told him that, on that occasion, Ms. Nichols got some additional money that he did not intend for her to have. Mr. Irving was also aware of the gift of the truck to Ms. Nichols. At that point, Mr. Irving had full knowledge of Mr. Smith's financial affairs, and he knew that Mr. Smith did not have any close relatives to whom he wanted to leave his assets, for in the March will he wanted it to go to Mrs. Streater and in the May wills he wanted it to go to Ms. Gaston. Furthermore, he knew that he had made a substantial gift to Ms. Nichols who he had only known for seven months. With this knowledge, Mr. Irving went to the bank with Mr. Smith, and they had Mr. Irving added as an authorized signer on Mr. Smith's bank accounts. Later, the funds were placed in a joint account so that they would go to Mr. Irving upon Mr. Smith's death. Mr. Irving testified that on December 25, 1996, Mr. Smith told him that he wanted to leave most of his assets to him and his wife. A lawyer going to a client's home twenty miles from his own on Christmas morning seems highly unusual. Mr. Irving knew that he could not prepare such a will if it was to be valid, so he made an appointment for Mr. Smith to see Solomon Osborne to have the will prepared. Mr. Irving even carried his video equipment to Mr. Osborne's office so that a video could be made of the will signing. Mr. Smith met with Mr. Osborne on January 6 and on February 1, when the will was signed, and a portion of what occurred on both days in Mr. Osborne's office is on video tapes which are in evidence. In the preparation of the February will, the video makes it clear that Mr. Osborne was going by the May 22, 1996, will which had some inter-lineations made on it. In fact, from the similarity of terminology between the May and February wills, the Court concludes that the will was

just retyped verbatim except that the interlined changes were made. The February will was apparently prepared and signed in Mr. Osborne's office on a Saturday, though his office is not normally open on Saturday, and no one knew of it other than Mr. and Mrs. Irving and those present in Mr. Osborne's office at the time of the execution. There is no evidence that Mr. Smith ever told anybody other than these of his intent to leave the bulk of his estate to Mr. and Mrs. Irving. In December 1996, he did tell Trina Nichols that he was going to change his will and that he might leave his assets to her, and at some point, in 1996, he told Tilla Rucker that he was going to change his will so that most would not go to Ms. Gaston. Except for Mr. Irving and Mr. Osborne he never told anyone that most of his assets would go to Mr. and Mrs. Irving.

The three prong test set out above must be applied to these facts. The only person to say that Mr. Smith initiated the procurement of the February will is Mr. Irving, and the cases cited above say that evidence to rebut the presumption must come from another source. The facts do reveal that Mr. Irving made the appointment with Mr. Osborne, and he carried him and picked him up on both visits to Mr. Osborne's office. The will was prepared and signed at the office of Solomon Osborne whom Mr. Irving had selected to prepare the will since Mr. Smith had no knowledge of him until referred by Mr. Irving. The only persons present for the execution were Mr. Osborne, his part-time secretary, his daughter, and his daughter's friend. No consideration was paid for the preparation of the will. Mr. Osborne's explanation of this was limited in that he said he often prepared wills for nothing, but here was a man who was not his regular client and who he knew had the ability to pay. Further there is the question of whether he prepared it as an accommodation to his fellow attorney, Mr. Irving.

On the issue of the secrecy of the execution in In Re Estate of Smith, Supra, the Court said, "--the actual issue to be addressed is whether the physical place the will was executed was in plain view of the witnesses--. There have been no suggestions that the testatrix was secretive with the attesting witnesses." In Roger v. Pleasant, 729 So. 2d 192, the Court said, " The record reveals that the execution of Littie's will took place in Graham's office before two attesting witnesses, Graham and Guynes. Littie told Graham how she wanted her estate disposed of, and he prepared the will at her direction." In light of these cases, the Court concludes that all that is required to overcome the secrecy issue is to show that the witnesses knew that a will was being executed. It seems to the Court that if this is all that is required to pass this part of the test it would never be a factor unless there was a gift or a holographic will, and that what was intended in the test in referring to secrecy is secrecy from people other than scrivnes [sic] or the witnesses. The Court, however, accepts the statement from said two cases as to what constitutes secrecy and in doing so finds the will was not executed in secrecy though it was done on a Saturday and though only Mr. and Mrs. Osborne and those clearly assorted [sic] with them being aware of execution.

These facts relate to the subparts of prong one of the test as enumerated in the *Estate of Smith, Supra*, but there are other facts which this Court finds relevant to the issue of Mr. Irving's good faith here. Since May 1996, when Mr. Irving first met Mr. Smith, he had known that Mr. Smith had about $80,000.00 in the bank plus some land. He knew from the May will that this ninety-nine year old was disposed to leave the bulk of his estate to a person who befriended him and showed interest in him but to whom he was not related. In December, he got further evidence of this when Mr. Smith gave Trina Nichols over $12,000.00. Between May and December, Mr. Smith came to Mr. Irving's office often, and Mr. Irving went to Mr. Smith's house often. In January 1997, while Mr. Irving was with him at the bank, Mr. Smith had a check written to Mr. Irving's wife and daughter for $10,000.00

each and to his mother and mother-in-law for $1,000.00 each. Later, in January, a check was written to Mr. Irving for $10,000.00. There is no evidence of why Mr. Smith made these gifts unless he just knew his life was drawing to an end, and he wanted to dispose of his assets. There was no evidence of any independent consent or action as to these gifts. In addition, he placed all of his remaining funds in a joint account where they would go to Mr. Irving upon his death. This being true, there would be no funds with which to pay the specific bequests in the May 22 will or the February 1 will.

Mr. Irving contends that the statements made by Mr. Smith on the January 6 and February 1 videos rebut the presumption of undue influence. He did have Mr. Smith go to Mr. Osborne's office to have the will written, and the videos reveal that he wanted most of his assets to go to Mr. and Mrs. Irving, for Mr. Osborne asked him about that. However, conspicuously absent from the video of Mr. Osborne's interview with Mr. Smith is any explanation of why he wanted to leave the bulk of his estate to the Irvings. It would have been extremely easy for Mr. Osborne to have asked him to explain to him, in his own words, why he wanted the assets to go to the Irvings. The only explanations are (1) he states on the video why he does not want Hallie Streater, his stepdaughter, and some of his other relatives to get his assets, and (2) Mr. Irving's testimony of the call to come to his house on Christmas Day when he said that he wanted to leave most of his assets to the Irvings. Maybe Mr. Irving acted in total good faith, and all the interest he showed in Mr. Smith was simply out of the kindness of his heart. Maybe Mr. Irving just had a sincere desire to help this old man who had no relatives with whom he was close. Maybe this desire motivated him to make all the twenty mile trips to Mr. Smith's house to run errands his friends and neighbors had been running for years, and maybe it was out of the kindness of his heart that Mr. Smith decided to leave the bulk of his estate to Mr. Irving. On the other hand, maybe when Mr. Irving obtained knowledge of Mr. Smith's substantial assets in May and learned of his willingness to leave those assets to someone other than his relatives, he was motivated to develop a most unusual attorney-client relationship with him in hopes that he would leave his assets to him and that this and not the kindness of his heart is what motivated him. The above cited case law requires that Mr. Irving prove his good faith by clear and convincing evidence. The case law further indicates that this must be proven by evidence other than Mr. Irving's testimony. With the development of this unusual attorney-client relationship between May and December, with the substantial gifts to Mr. Irving and his family, and with the opening of the joint accounts where all the funds would go to Mr. Irving upon his death, with Mr. Irving's involvement with the preparation of the will, and without any direct explanations from Mr. Smith of why he wanted the Irvings to get his assets, the Court does not find Mr. Smith's statements on the videos that he wanted his assets to go to the Irvings sufficient to rebut the presumption, and the Court does not find that Mr. Irving has proven that he acted in good faith by clear and convincing evidence.

In reaching this conclusion, the Court has had to weigh Mr. Smith's clear statements on the video that he wanted the assets to go to the Irvings against the mandate of the law as expressed in Hendrick v. Jones, Supra, that the Court protect people such as Mr. Smith. The burden is on Mr. Irving to prove this by clear and convincing evidence that the presumption is rebutted. With the way things developed between May 3, 1996, and February 1, 1997, the Court does not find that he has done that. The referral to Osborne and the statements on the video support Mr. Irving's position, but this Court concludes that they do not rebut the other evidence.

Item two of the test requires full knowledge and deliberation in the execution. The first factor in this prong of the test is evidence that he was aware of his assets and their value. The video interviews with

Mr. Osborne do not make this clear, but from other evidence, the Court concludes he did. He clearly knew that he had certificates of deposit, for in August, he was concerned about what he thought was an unexplained withdrawal from his account, and he knew to make the withdrawal to give Mrs. Irving and Ms. Nichols each $500.00, and a withdrawal to get the $15,000.00 with which he bought Ms. Nichols a car. Since he still lived alone, he knew of his ownership of the house and land, and he clearly refers to his thirty-seven acres in the video. The video convinces the Court that he knew who his natural inheritors were, for in it, he identified his step daughter, his deceased brothers and sisters and most of their children and some grandchildren, and he was able to give specific facts about why he did not want them included in his will. With the experiences that he had in executing three wills in his efforts to reform his will to fit his wishes, the Court finds that he understood what would happen to his prior wills. Though Tyree Irving called him uncle, the Court concludes from the other knowledge that he had about relatives, that he knew that Mr. Irving was not related to him when he included him in the will. From these facts, the Court finds that he knew where his funds were, and he knew that Tyree Irving had joint control of the funds as indicated in the video. The Court also concludes that he knew who his relatives were and what his assets were, but there is only limited data about what deliberation he made in deciding to leave the bulk of his estate to the Irvings. Here again, it would have been easy for Mr. Osborne to have gotten him to explain, in his own words, what thought he had given and what motivated him to do what he did. Mr. Irving testified that on December 25, he told him that he wanted to leave his assets to him. On January 6, he told Mr. Osborne that he wanted to leave his assets to Mr. and Mrs. Irving. This testimony indicates that he gave thought to the disposition for over a month, but part of the evidence is from Mr. Irving. The case law stated above indicates the proof to rebut the presumption must come from a source other than a beneficiary. The videos do reveal that on January 6 and February 1, he wanted his assets to go to the Irvings. They do not shed much light, though, on what thought he had given to the decision. There is no evidence that he ever discussed these plans for his estate with anyone else. From these facts, the Court concludes he knew what his assets were and who his relatives were, but it cannot determine what deliberation he made.

The third prong of the test is that there be evidence of independent consent and action by the testator. Though the Court has modified the Murray case position on what is required to prove this, in Madden v. Rhodes, Supra, it still says that the best way to prove this is by advice of a competent person disconnected from the grantee and devoted solely to the testator's interest. It was obviously with a desire to meet this prong of the test that Mr. Irving referred Mr. Smith to Mr. Osborne for the preparation of the February 1997, will. As an attorney, Mr. Osborne would qualify as a competent person. There is some question, though, whether he was disconnected from the beneficiary and devoted wholly to the testator's interest. Mr. Irving and Mr. Osborne had been friends for some time. Mr. Irving referred Mr. Smith to Mr. Osborne and made the appointment with Mr. Osborne. Mr. Irving provided the video equipment for the recording of the conference with Mr. Osborne. There is no evidence that Mr. Osborne requested the use of the equipment, so the Court concludes that Mr. Irving suggested that it be used and took it to his office. The videos further reveal that Mr. Smith did not, on his own, tell Mr. Osborne how he wanted his estate disposed of. Instead, he carried a copy of his May will that had been marked on by somebody. The statements made by Mr. Smith on the videos indicates handwritten inter-lineations were made on it by somebody other than him. Though Mr. Smith never specifically says that Mr. Irving made the inter-lineations, the Court concludes that they were made by Mr. Irving for there is no evidence that Mr. Smith ever confided in anyone else

about his will from May 22 until January 6. The questions he asked about whether Mr. Irving could serve as executor makes it clear that Mr. Smith did not make the changes himself. These videos do not reveal Mr. Osborne giving Mr. Smith any advice. Instead, they reveal that Mr. Osborne questioned him about data on the marked up document and the Mr. Smith told Mr. Osborne who his relatives were and why he did not want them to take. With these facts, the Court cannot find he got advice from an independant [sic] person disconnected with the beneficiary. The test, however, does not require the independent advice any longer. It now only requires independent consent and action. So even if conferring with Mr. Osborne did not constitute obtaining advice from one devoted solely to Mr. Smith, Mr. Irving was not present, and he could have told Mr. Osborne anything he wanted. He chose to tell him that he wanted to leave assets to Mr. and Mrs. Irving, and he ratified the changes on the will that Mr. Osborne was referring to. It is unclear what motivated him except that he explained why he did not want Hallie Streater to take under the will and why he wanted to leave out most of his relatives. Since Mr. Smith came to Mr. Osborne's office, with a copy of the May 22, 1996, will which had been modified by someone other than Mr. Smith to include the Irvings as beneficiaries and since all Mr. Osborne really did was to retype the May 22 will making the inter-lineated changes, the Court cannot find that Mr. Irving has proven independent consent and action by a ninety-nine year old. Here again, Mr. Irving argues that the videos satisfy this part of the test, and it is true that, on the video, Mr. Smith says that he wants most of his assets to go to the Irvings as indicated on the modified May 22 will that Mr. Osborne was using, but the Court concludes that the statements on the tape are not strong enough to rebut the presumption when Mr. Osborne did only what the marked up will that Mr. Smith brought with him indicated.

If Mr. Smith had gone to a lawyer he selected without any input form [sic] Mr. Irving and without any involvement by Mr. Irving in dealing with the lawyer, if he had gone to the lawyer with the May 22 will with no marks on it, and if he in his own words had told the lawyer how he wanted it changed and why he wanted it so changed, this would have probably been sufficient to rebut the presumption, but that did not occur.

In summary, the Court finds that Benny L. Smith was competent to execute a will on February 1, 1997, when he executed the will now before the Court, that there is no direct evidence of any undue influence by Tyree or Ethola Irving, but the data on the videos is not sufficient to rebut the presumption of undue influence that exists because of Mr. Irving's fiduciary relationship and involvement with the preparation of the will. To rebut the presumption, clear and convincing evidence is required, and though Mr. Smith says on the video that he wants his assets to go to the Irvings, the Court does not find this sufficient to overcome the other facts that have been described above. With this conclusion, the Court finds the will of Benny L. Smith dated February 1, 1997, is not his true last will and its probate should be revoked.

This Court is of the opinion that it takes really clear evidence to overcome the presumption where a ninety-nine year old leaves most of his estate to his lawyer and his wife, who he had known for only eight months, and that Mr. Smith's statements on the videos do not overcome the other evidence.

¶5. After independently reviewing the record, we find this to be an accurate and full accounting of the facts which gave rise to the making of the February 1 will and a correct application of these facts to our case law.

¶6. We agree with the chancellor that Irving's acts, as outlined by the chancellor, are sufficient proof of

active participation in the procurement of the February 1 will such that the presumption of undue influence arose. The chancellor was not manifestly wrong nor did he clearly err in reaching this conclusion; and therefore, we affirm his decision as to Issue I. We disagree with Irving's assertion that the chancellor applied an incorrect standard when analyzing whether Irving rebutted the presumption of undue influence by clear and convincing evidence. The chancellor's opinion clearly states that even using the independent action and consent test, Irving has not proven independent action and consent by Smith by clear and convincing evidence. We therefore conclude that the chancellor not only cited the appropriate language for the third prong of the test for rebutting the presumption of undue influence, he properly applied the correct standard to the volume of facts in support of his position in his analysis. Issue II is without merit.

¶7. The chancellor's analysis also persuades us that he wholly considered each prong of the undue influence test and found the facts insufficient to overcome the presumption by clear and convincing evidence. We will affirm the chancellor where his findings are supported by substantial, credible evidence. We conclude that his opinion is indeed supported by substantial and credible evidence and his ruling that Irving failed to rebut the presumption of undue influence by clear and convincing evidence is not manifestly wrong or clearly erroneous and not the result of applying an erroneous legal standard. We therefore affirm his ruling as to Issue III.

## CONCLUSION

¶8. The judgment of the Chancery Court of the Second Judicial District of Carroll County is, therefore, affirmed.

¶9. **AFFIRMED.**

**SMITH, P.J., COBB AND CARLSON, JJ., CONCUR. EASLEY, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McRAE, P.J., DIAZ AND GRAVES, JJ. WALLER, J., NOT PARTICIPATING.**

**EASLEY, JUSTICE, DISSENTING:**

¶10. In my view, the plurality errs in its reasons for affirming the chancery court's determination that the Tyree and Ethola Irving failed to overcome the presumption of undue influence by clear and convincing evidence.

¶11. As the plurality notes, this Court has held that "[a] Chancellor's findings of fact will not be disturbed unless they are manifestly wrong or clearly erroneous, or unless the chancellor applied an erroneous legal standard."*In re Estate of Grantham*, 609 So.2d 1220, 1223 (Miss. 1993). *See also In re Estate of Grubbs*, 753 So.2d 1043, 1046 (Miss. 2001); *Griffin v. Armana*, 687 So.2d 1188, 1192 (Miss. 1996); *Madden v. Rhodes*, 626 So.2d 608, 616 (Miss. 1993). Reversal is not warranted by this Court if the chancellor's findings are supported by substantial, credible evidence which support the findings. *Id*.; *In re Estate of Harris*, 539 So.2d 1040, 1043 (Miss. 1989). Upon a review of the complete record, "if substantial evidence does not support the assertion that the Chancellor's findings were manifestly wrong, this Court is bound to affirm the trial decision." *Vega v. Estate of Mullen*, 583 So.2d 1259, 1263 (Miss. 1991).

¶12. Based on testimony presented at trial, the chancellor made his decision on findings of fact which, I believe, rebutted the presumption of undue influence by clear and convincing evidence. In reviewing the

lengthy trial transcript and the videotapes in this case, I believe the chancellor's ruling was manifestly wrong and clearly erroneous. There is an additional question of whether the chancellor may have heightened the evidentiary standard by requiring Bennie Loyd Smith to have stated reasons for including the Irvings in his will. This is not a requirement to rebut the presumption of undue influence and to the extent that the plurality concurs with the chancellor's reasoning on this issue, the decision today is also erroneous. Further, the findings by the chancery court are in conflict with its own decision. There is no substantial evidence to demonstrate that Irvings did not act in good faith. Smith clearly had full knowledge and deliberations in the execution of the will, and he exercised independent consent and action. Consequently, the plurality's opinion is incorrect, and I respectfully dissent.

## I.

¶13. Since the modification of the *Murray* test, this Court continues to hold that to overcome a presumption of undue influence by a clear and convincing standard the evidence must show that (1) the proponent of the will exhibited good faith in the fiduciary relationship with the testator; (2) the testator acted with knowledge and deliberation when he executed the will; and (3) the testator exhibited independent consent. *In re Fankboner*, 638 So.2d 493,495 (Miss. 1994)(citing *Murray v. Laird*, 446 So.2d 575, 578 (Miss. 1984) *modified*, *Mullins v. Ratcliff*, 515 So.2d 1183, 1193 (Miss. 1987)).

¶14. This Court in *In Re Last Will and Testament and Estate of Smith*, 722 So.2d 606, 612 (Miss. 1998), set forth the modified *Murray* test with its enumerated factors to overcome this presumption of undue influence, by clear and convincing evidence, as follows:

1. The beneficiaries must have acted in good faith.

a. Who initiated the procurement of a will?

b. Where was the will executed and in whose presence?

c. What consideration was paid?

d. Who paid the consideration?

e. Was there secrecy or openness in the execution?

2. The testatrix must have had full knowledge and deliberation in the execution.

a. Was the testatrix aware of her total assets and their general value?

b. Did the testatrix understand who her natural inheritors were?

c. Did the testatrix understand how the change would legally effect prior wills?

d. Did the testatrix know that non-relative beneficiaries would be included?

e. Did the testatrix know who controlled her finances and by what method?

1. How dependent is the testatrix on those handling her finances?

2. How susceptible is she to influence by those handling her finances?

3. The testatrix must have exhibited independent consent and action.

II.

## A. The beneficiaries must have acted in good faith.

1. Who initiated the procurement of a will?

¶15. The testimony reflects that Tyree Irving (Tyree) referred Smith to attorney Solomon Osborne. Video equipment was set up at Osborne's office by Tyree on January 6, 1997. Smith hired a person to drive him to Greenwood on January 6, 1997. When Smith arrived at Tyree's office, Tyree took Smith to Osborne's office on January 6, 1997, for the initial interview. Tyree testified that Smith went to Osborne's office on January 6 on his own initiative and not as the result of his urging. The interview took over an hour to complete. Tyree testified that he picked up Smith after the interview. However, Tyree was not present for the taping. To the best of Tyree's recollection, he also dropped off and picked up Smith at Osborne's office on February 1, 1997, the date of execution of the will. Tyree was not present at the signing of the February 1, 1997, will nor the drafting of the will.

2. Where was the will executed and in whose presence?

¶16. The will was executed at Osborne's law office. In addition to Smith, Osborne; Lawanda Ellis, his part-time secretary; and the two attesting witnesses, Kai Osborne, Osborne's daughter, and Deborah Talvert, were present the day the will was executed.

3. What consideration was paid? / 4. Who paid the consideration?

¶17. In regard to consideration, the chancellor stated the following:

> No consideration was paid for the preparation of the will. Mr. Osborne's explanation of this was limited in that he said he often prepared wills for nothing, but here was a man who was not his regular client and who he knew had the ability to pay. Further, there is the question of whether he prepared it as an accommodation to this fellow attorney, Mr. Irving.

Osborne testified that no consideration was paid by Smith for the preparation of the will. When questioned by the chancellor, Osborne explained in detail as follows:

Q. It wasn't no charge just because of your accommodation of Tyree?

A. Let me just say this. I don't know whether I didn't get paid because I didn't send a bill out, or whether I just did it, you know, because he is an old man. So I don't know why I didn't get paid. The only thing I know is that when I went back I found that I didn't get paid.

Q. When you do wills you don't normally get paid at the time you deliver them, rather than billing them later?

A. No, you know, I bill a lot of people, and it is not unusual. I have done wills for people, especially if they are real old and don't charge them anything, whether they have got assets or not. That is not the criteria that I use. I know that I didn't get paid for it by anybody.

Furthermore, Osborne testified that Tyree did not pay him for his legal services, nor did Tyree offer to pay Osborne.

5. Was there secrecy or openness in the execution?

¶18. In regard to execution of the will, the chancellor stated in part the following:

The Court...finds the will was not executed in secrecy though it was done on a Saturday and though only Mr. Irving and Mrs. Irving and Mr. Osborne and those clearly assorted with them being aware of execution.

The Irvings maintain that neither they were not aware of the execution of the will until after it was done and that they were not present for its execution. Testimony from Tilla Rucker ("Rucker"), a long-time friend of Smith's, also, indicated that Smith wanted to change his will and delete Gatson. Furthermore, at one point, Smith told Nichols that he may change his will and include her as a beneficiary for money and land.

¶19. In addition to the above cited factors, the chancellor considered the gifts of money to the Irvings and their family members; the opening of a joint account with Tyree; the involvement of the preparation of the will and no explanation by Smith as to why he wanted to leave most of his assets to the Irvings. Further, the chancellor found the videos did not rebut the presumption of undue influence. Consequently, the chancellor found that the Irvings did not prove by clear and convincing evidence that the good faith element overcame the presumption.

¶20. This Court in *In re Estate of Dabney*, 740 So.2d 915, 921-22 (Miss. 1999), found no good faith where a person "not unconnected to the beneficiary", admitted to making unauthorized changes to the will. The testatrix signed the will believing that the provisions were in accordance to her request. *Id.* Clearly, any involvement that the Irvings may have had in the case sub judice is distinguishable from the facts and the finding of no good faith in *Estate of Dabney* or otherwise.

¶21. The chancellor relied upon more factors than those outlined in ***In Re Last Will and Testament and Estate of Smith***, 722 So.2d at 612, and harped upon the fact that Osborne did not ask Smith why he wanted to leave assets to the Irvings; *clearly not a specific requirement to rebut the presumption of undue influence*. To the extent that the standard may have been heightened by the trial court's reference to Smith's lack of a reason for leaving assets to the Irvings, I believe, this erroneous requirement is misplaced and cannot be considered a factor to support a finding that the Irvings failed to rebut the presumption of undue influence.

¶22. Further, after reviewing the videotapes, I believe that the chancellor is manifestly wrong in determining that the videotapes did not rebut the presumption. The videotapes are compelling in the case before this Court. The viewer has the opportunity to observe first-hand the demeanor of Smith and his knowledge and intent in regard to his wishes for his last will and testament.

**B. The testator must have had full knowledge and deliberation in the execution.**

1. Was the testator aware of his total assets and their general value?

¶23. The chancellor stated the following in regard to the awareness of the testator's assets:

Item two of the test requires full knowledge and deliberation in the execution. The first factor in this prong of the test is evidence that he was aware of his assets and their value. The video interviews with Mr. Osborne do not make this clear, but from other evidence, the Court concludes that he did. He clearly knew that he had certificates of deposit, for in August, he was concerned about what he thought was an unexplained withdrawal from his account, and he knew to make the withdrawal to give Mrs. Irving and Ms. Nichols each $500.00 and a withdrawal to get the $15,000.00 with which he bought Ms. Nichols a car. Since he lived alone, he knew of his ownership of the house and land, and he clearly refers to his thirty-seven acres in the video.

In *Vega v. Estate of Mullen*, 583 So.2d at 1264, a deed conveyance case, this Court found that the fact that Mrs. Mullen remained in complete control of her finances satisfied by overwhelming evidence that she met the second prong of the test. She maintained her own bank accounts, paid her own medical bills, and the value of her property was based on Mrs. Mullen's estimates. *Id.* Likewise, the evidence and even the trial court's findings determine that Smith was very aware of his assets when executing the February 1 will.

2. Did the testator understand who his natural inheritors were?

¶24. The chancellor determined that Smith knew his natural inheritors. The chancellor stated that "[t]he video convinces the Court that he knew who his natural inheritors were, for in it, he identified his stepdaughter, his deceased brothers and sisters and most of their children and some grandchildren, and he was able to give specific facts about why he did not want them included in his will." In fact, Smith relates with remarkable detail all of his natural inheritors in his videos.

3. Did the testator understand how the change would legally affect prior wills?

¶25. The chancellor concluded that with the experience of executing three prior wills, Smith understood the effect of his prior wills.

4. Did the testator know that non-relative beneficiaries would be included?

¶26. The chancellor concluded that despite, Tyree referring to Smith as "uncle", coupled with knowledge of his relatives, Smith knew that Tyree was a non-relative beneficiary.[1]

5. Did the testator know who controlled his finances and by what method?

a. How dependent is the testator on those handling his finances?

¶27. The chancellor concluded that Smith knew where his funds were and knew that Tyree had joint control of the funds as indicated in the video.

¶28. As to the chancellor's statement that Smith knew about the funds indicated on the video, the Irvings contend that Smith never spoke of anything concerning the funds on the tape. Further, the Irvings maintain that during the time of the January 6 interview, Tyree was a joint signatory on a checking account only and not on the $25,000.00 certificate of deposit. On January 27, 1997, the checking account and the certificate of deposit were closed. Smith gave Tyree $10,000.00 and deposited the rest of his money in a Holmes County bank without any signatory on the account. At the time of the execution of the February 1, 1997, will, Tyree was not on any of Smith's accounts. Accordingly, Smith was abundantly independent and in no way dependent on anyone when handling and knowing the full extent of his finances.

b. How susceptible is he to influence by those handling his finances?

¶29. The chancellor did not specifically address the issue of susceptibility to influence. Nor did the Irvings or Streater. However, testimony from numerous individuals at the hearing indicated that Smith had a strong will. Rucker stated that Smith was strong willed and not easily influenced. J. W. Burch, Willie Jordan, and Gatson also testified that Smith was strong willed. Susan Clinksdale, an employee at Deposit Guaranty, testified that on January 6, 1997, Tyree was not exerting any influence on Smith nor did he appear to be "running things" for Smith while at the bank.

¶30. Incredibly, despite finding that Smith met the full knowledge requirements under the second prong of the test, the trial court determined that it could not determine what deliberations were made by Smith. The reasoning behind the chancellor's finding was as follows:

> From these facts, the Court finds that he knew where his funds were, and he knew that Tyree Irving had joint control of the funds as indicated in the video. The Court also concludes that he knew who his relatives were and what his assets were, but there is only limited data about what deliberation he made in deciding to leave the bulk of his estate to the Irvings. Here Again, it would have been easy for Mr. Osborne to have gotten him to explain, in his own words, what thought he had given and what motivated him to do what he did. Mr. Irving testified that on December 25, he told him that he wanted to leave his assets to him. On January 6, he told Mr. Osborne that he wanted to leave his assets to Mr. and Mrs. Irving. This testimony indicates that he gave thought to the disposition for over a month, but part of the evidence is from Mr. Irving. The case law stated above indicates that the proof to rebut the presumption must come from a source other than a beneficiary. The videos do reveal that on January 6 and February 1, he wanted his assets to go to the Irvings. They do not shed much light, though, on what thought he had given to the decision. There is no evidence that he ever discussed these plans for his estate with anyone else. From these facts, the Court concludes he knew what his assets were and who his relatives were, but it cannot determine what deliberation he made.

However, the chancellor acknowledged that Smith gave thought to the disposition *for over a month*, although some of the information came from Tyree, a beneficiary. Despite any information from Tyree, the facts still show that Smith went to Osborne's office on January 6 for the interview and indicated his wishes in regard to disposition and distribution of his assets in a videotape. Approximately three weeks later, Smith returned to Osborne's office and signed the February 1, 1997, will which was also videotaped. There was no proof that the Irvings were present during either visit to Osborne's office. In addition, Osborne testified that prior to signing the February will, Smith wanted to include his great niece, Mrs. Hoskins ("Hoskins"). Osborne had to redo the will on February 1, 1997, to add Hoskins before Smith executed the document.

¶31. This Court in [Rogers v. Pleasant](), 729 So.2d 192, 194 (Miss. 1999), found that Littie Pleasant satisfied the second prong of the test because she was described as strong willed, she knew the extent and worth of her assets, she controlled her money and participated in investment decisions. It flies in the face of reason for the chancellor to review the facts and to find that the knowledge factor of the second prong of the test was met and yet to conclude that no deliberation was made. The chancellor specifically determined that Smith "gave thought to the disposition for over a month." He further determined that Smith was competent at the time of signing the will on February 1, 1997. In addition, I believe that the videotapes demonstrate that Smith had full knowledge and deliberation in the execution of the will, and the chancellor's contrary determination is clearly erroneous.

### C. The testator must have exhibited independent consent and action.

¶32. As noted above, the trial judge appears to have heightened the standard of proof when he referred to the lack of Smith's reasoning why he wanted the Irvings to benefit under the will. In discussing Smith's independent consent and action, the chancellor commented again that Smith did not state why he wanted to leave assets to the Irvings. However, this is *clearly not a specific requirement to rebut the presumption of undue influence*. The chancellor stated the following, in part:

> If Mr. Smith had gone to a lawyer he selected without any input form [sic] Mr. Irving and without any involvement by Mr. Irving in the dealing with the lawyer, *if he had gone to the lawyer with the May 22 will with no marks on it, and if he in his own words had told the lawyer how he wanted it changed and why he wanted it so changed, this would have probably been sufficient to rebut the presumption*, but that did not occur.

(emphasis added). The videotapes show that Smith knew his intended beneficiaries and stated such verbally on the videos. Smith knew his relatives and extended family. While at Osborne's office, Smith signed the February 1, 1997, will in the presence of two attesting witnesses, and his demeanor demonstrated his knowledge of what he was doing and his full mental capacity at the age of ninety-nine. Smith was known by many witnesses to be a strong-willed person.

¶33. Smith acted independently in the execution of his will. Smith conferred with Osborne concerning the changes to his will, including a last minute addition of a relative to the will on February 1. He stated that he wanted the Irvings to be beneficiaries in the will both during the January 6 interview and through the signing of the February 1, 1997, will. The chancellor's finding that Smith did not have independent consent and action is clearly erroneous.

### III.

¶34. For the above reasons, I respectfully disagree with the plurality opinion. The chancellor's findings and conclusions are manifestly wrong and clearly erroneous. The videotapes coupled with other testimony demonstrated that the Irvings overcame the presumption of undue influence by clear and convincing evidence and the February 1, 1997, will should be determined to be the last will and testament of Bennie Loyd Smith. Accordingly, I would reverse and render the judgment of the chancery court on this matter.

**McRAE, P.J., DIAZ AND GRAVES, JJ., JOIN THIS OPINION.**

1. Smith was referred to as "Uncle Loyd" by many testifying and in the community, regardless of whether they were actual blood relatives.